[Civ. No. 19273. Second Dist., Div. Two. Feb. 10, 1953.]

CHRYSLER CORPORATION, Respondent, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Appellants.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, William L. Shaw and Vincent P. Lafferty, Deputy Attorneys General, for Appellants.

Wright, Wright, Green & Wright, Loyd Wright and Charles A. Loring for Respondent.

FOX, J.—The judgment appealed from vacated the decision of the Unemployment Insurance Appeals Board granting unemployment insurance benefits to certain claimants,

employees of petitioner, and directed the issuance of a writ of mandate ordering that all charges made to or against the account of petitioner because of such payments be removed from the books of the California Employment Stabilization Commission.

Petitioner manufactures and sells automobiles. Its domicile and principal factory are in Michigan. One of its assembly plants is at Los Angeles where the claimants are employed. In April, 1949, they applied to the Department of Employment for unemployment benefits on the ground that they had been laid off by petitioner. The latter protested the granting of the claims on the ground that they had left their employment because of a trade dispute. The Department of Employment ruled claimants were eligible for unemployment benefits. This decision was upheld by a referee and the Unemployment Insurance Appeals Board. Thereupon, petitioner sued out a writ of mandate in the court below where the controversy was submitted on the record of the administrative tribunal.

The trial court made independent findings of fact based on the administrative record prepared by the commission. In the main these findings are largely in accord with those made by the administrative officers as far as the objective circumstances resulting in the claimants' loss of employment are concerned. However, the trial court included a crucial finding, not only absent from the written opinion of the Appeals Board but diametrically opposed to its determination, that the claimants were, in effect, responsible for their own unemployment and hence disqualified from receiving benefit payments.

Petitioner employs both union and nonunion workers in its Los Angeles plant. All of petitioner's employees are divided into four separate groups for the purpose of bargaining collectively, to wit: (1) production and maintenance workers; (2) engineers; (3) office workers; (4) cafeteria workers. The International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (hereinafter referred to as the UAW), an affiliate of the Congress of Industrial Organizations (C.I.O.), is the collective bargaining agent for each of the categories of workers above named. The four groups of workers employed by petitioner at its Los Angeles plant are represented by Local 230 of the UAW, although in other geographical areas where there is a greater concentration of workers each group is repre-

sented by separate local organizations of the same union. All of the claimants for benefits here involved are office workers, some of them members of Local 230, the rest nonmembers. The office workers' unit of Local 230 was the bargaining agent for all such workers, union and nonunion. Each of the four groups of workers had entered into separate bargaining agreements with petitioner, although each agreement was negotiated through the National Negotiating Committee of the UAW, which committee is the representative negotiating agency of all petitioner's employees.

In June, 1949, the labor relations between petitioner and its employees were governed by its written agreement with the UAW dated April 26, 1947, as amended May 28, 1948. On June 23, 1949, the UAW, through its representative, Mr. Norman Mathews, Director, National Chrysler Department of the said union, served upon petitioner at its head office in Detroit, Michigan, written demands for changes in the basic labor agreement between petitioner and employees in behalf of all the individual categories of workers, including the claimants herein. Petitioner's refusal to accede to these demands engendered a labor dispute involving protracted negotiations. Under the provisions of the constitution of the UAW, such negotiations are conducted between the National Negotiating Committee of said union and the particular employer affected. The National Negotiating Committee, in its bargaining conferences with petitioner, consisted of the presidents of all the local unions within petitioner's establishments across the nation, including the president of Local 230, and was headed by Mr. Mathews in his capacity as director, National Chrysler Department. The negotiations having proved abortive, the National Negotiating Committee recommended that a vote be taken among the membership of the various local unions to determine whether or not the members would strike if called upon to do so at the discretion of the UAW in support of the demands made upon petitioner. On August 16, 1949, the production worker members and office worker members of Local 230 (as well as the other categories) voted, by secret ballot, to strike petitioner's Los Angeles plant if requested to take such action by the UAW. This same decision was reached by members of all other locals of the said union employed in petitioner's plants throughout the United States.

Negotiations between the parties continued sporadically until January 23, 1950, at which time the National Chrysler

Conference and the National Negotiating Committee arrived at a determination that, as a matter of strike strategy and policy, only the production workers would be directed to strike, while the office workers would remain at their jobs together with other units of petitioner's employees. This recommendation was approved and adopted by the executive board of the UAW on January 24, 1950, and its decision was immediately reported to the various local unions of the organization. On the same day on which it was advised of the executive board's strike policy, office worker members of Local 230 attended a general meeting where they voted to conform to and abide by this decision. On January 25, 1950, the production workers employed by petitioner, acting in pursuance of the executive board's policy decision, went out on strike until the settlement of the dispute on May 4, 1950. The office workers as a group continued to work for petitioner, passing through the picket lines established by the production workers at the main gate of petitioner's plant. The petitioner utilized the services of the office workers both to complete work already undertaken and in expectation of an early settlement of the dispute, but within three weeks after the production workers launched their strike, there occurred a gradual diminution of work for the office personnel. Finally, on or about April 19, 1950, petitioner notified its office workers that as a consequence of the strike, operations had been paralyzed at the Los Angeles plant and advised them that their services were no longer required because of a lack of work. Some of the claimants testified that for some weeks before April 19, 1950, operations had been so drastically curtailed that they sat around either in idleness or engaged in knitting to occupy their time.

The strike against petitioner, which was concluded on or about May 4, 1950, with both sides agreeing to new contracts, was intended to procure broad economic benefits for all groups of its employees. Each category of worker had a direct interest in the outcome of the strike, and the contracts negotiated in behalf of each bargaining group, as a prelude to the termination of the production workers' strike, contained changes which were practically identical in terms and resulted in substantially similar benefits.

As already appears, the trial court, in making findings of fact in consonance with the narrative of events set forth above, made the additional finding that all of the claimants (exclusively office workers) had voluntarily participated in

a trade dispute with petitioner and had engaged in conduct which set in motion a chain of events culminating in the closing of petitioner's Los Angeles plant, thus causing their own unemployment. The court found further that as a result of their actions in connection with the trade dispute, the claimants had left their work within the meaning of section 56a of the Unemployment Insurance Act and were therefore ineligible for benefits under said act. The court, thereupon, granted a writ of mandate which in effect vacated the decision of the Appeals Board and directed that all charges made to the petitioner's account because of its award of benefits to claimants be stricken.

In determining the merits of this appeal, we are confronted with three questions requiring separate consideration: (1) was the trial court entitled to exercise its independent judgment on all the evidence before the administrative tribunal; (2) did the court correctly determine that the union office workers are excluded from benefits under section 56a of the Unemployment Insurance Act; (3) was the court correct in its decision that the nonunion office workers left their employment because of a trade dispute with reference to section 56a of the aforesaid act?

Appellants contend that the trial court was without power to reweigh the evidence; that under the restricted review procedure outlined in section 1094.5, Code of Civil Procedure, the court is confined to the question of whether the Appeals Board's decision is supported by substantial evidence. While this question has been enshrouded in some uncertainty, some of the doubt as to the scope of review by the trial court over the decisions of the Unemployment Insurance Appeals Board in a mandate proceeding, has been dissipated by the clarifying pronouncement of the Supreme Court in the recent case of *Thomas* v. *California Emp. Stab. Com.*, 39 Cal.2d 501 [247 P.2d 561]. The Thomas case involved a proceeding in mandamus brought by claimants for unemployment insurance benefits to compel the Appeals Board to authorize benefit payments. The board had issued an administrative order denying benefits on the grounds that claimants had disqualified themselves by leaving their employment in connection with a trade dispute. In ruling upon the issue of the extent of judicial review of adjudications of the Unemployment Insurance Appeals Board, the court spoke in the following language: "The appeals board is a statutory agency with statewide jurisdiction, and it does not have constitutional authority to make

final determinations of fact. (For general statutory provisions see Unemp. Ins. Act, 3 Deering's Gen. Laws (1949 Pocket Supp.) Act 8780d, §§ 1, 77 et seq.) Any person deprived of a property right by such an administrative body is entitled to a limited trial de novo in the superior court. (*Laisne* v. *State Board of Optometry*, 19 Cal.2d 831 [123 P.2d 457]; *Moran* v. *Board of Medical Examiners*, 32 Cal. 2d 301 [196 P.2d 20]; *Dare* v. *Board of Medical Examiners*, 21 Cal.2d 790 [136 P.2d 304].) In our opinion the benefits provided for by the Unemployment Insurance Act are property rights within the meaning of the term as used in the cases requiring a trial de novo.'' (*Thomas* v. *California Emp. Stab. Com., supra,* pp. 515-516.)

By a parity of reasoning, it seems clear that under the procedure established by the Unemployment Insurance Act for contributions by employers to the unemployment fund, petitioner has a direct pecuniary interest in any payments made to a claimant which may be charged against his reserve account. As an inducement for uninterrupted business operations and to minimize labor turnover, the act provides for a rate of contributions by an employer based upon the ratio of the employer's average base payroll to the amount of revenue with which he is credited on the books of the Employment Stabilization Commission. This is the so-called merit rating provision of the statute. Thus, an employer who provides continuous employment is required to make contributions to the fund at a rate lower than the 2.7 per cent which the statute fixes as the maximum contribution; and if his employment experience is favorable enough, as where his account on the commission's books reflects a prescribed excess of contributions over benefits paid, he is not required to make any contribution. (See §§ 39, 40, 41.) Any final decision of the administrative tribunal which awards benefits to a claimant has the effect of depleting an employer's reserve account, and may thereby adversely affect his rate of contributions to the fund during a particular rating period. It is of direct financial advantage to an employer to prevent inroads on his reserve account chargeable to benefit payments in order to protect his merit rating or to become eligible for a reduced rate of contribution. The imposition of an erroneous charge against an employer's account, with the attendant consequence of his having to pay an increased contribution, amounts to a wrongful deprivation of property.

The petitioner, as a contributing employer, has a vital

interest in the status or condition of its reserve account and since the administrative decision here in question may affect its financial responsibility to the unemployment fund, a sufficient right of property is involved to entitle it to a limited trial de novo as to the propriety of the charges made against its account.

There is sufficient evidence to sustain the trial court's determination that the *union* office workers are disqualified from receiving unemployment insurance benefits. Section 56(a) of the Unemployment Insurance Act, as amended in 1945, provides that a claimant is ineligible for unemployment benefits: "If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he is employed." (Stats. 1945, ch. 1178, p. 2225 as amended; 3 Deering's Gen. Laws, 1949 Pocket Supp., Act. 8780d, § 56(a).)

Although a literal reading of this language might suggest that eligibility for benefits was dependent on the objective ascertainment of the ultimate act which resulted in the cessation of employment, this section has been interpreted by the courts to require an analysis of whether the unemployment resulted from "the fact of voluntary action" by the claimant or whether he was compelled to leave his job because of the acts of others. (*Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321, 327-328 [109 P.2d 935]; *Matson Terminals, Inc.* v. *California Emp. Com.*, 24 Cal.2d 695, 703 [151 P.2d 202].) This "volitional" test postulates the need for an inquiry into the dynamics of the circumstances which have created the unemployment, the criteria for denial or awarding of benefits being the personal responsibility of the claimant for his unemployment in the former case (*McKinley* v. *California Emp. Com.*, 34 Cal.2d 239 [209 P.2d 602]), or the fault of the employer in the latter case. (*Bunny's Waffle Shop* v. *California Emp. Com.*, 24 Cal.2d 735, 741 [151 P.2d 224].) "The volitional test itself is based upon a just analysis of a substantial subjective element, and it cannot properly be extended or perverted by insistence upon mere form." (*McKinley* v. *California Emp. Com.*, *supra*, p. 245.) This language epitomizes the crucial essence of the "volitional" test, clearly refuting a mechanical reading of the statute, and requiring a searching evaluation of the economic realities involved in a particular trade dispute, a study of the interplay of pressure and counterpressure by the

contending factions, and a weighing of all the anterior events which have molded and inexorably evolved the pattern of resultant unemployment. ▮ Only by the equitable application of such a standard may we achieve the fundamental purpose of unemployment insurance, which is designed to cushion the impact of such impersonal industrial blights as seasonal, cyclical and technological idleness, and realize the policy expressed in the act of furnishing "benefits for persons unemployed through no fault of their own." (Stats. 1935, p. 1226; as amended, Stats. 1947, ch. 651, § 1; 3 Deering's Gen. Laws, 1949 Pocket Supp., Act. 8780d, § 1.)

▮ In applying these principles of law, which have been developed in harmony with the legislative objective of providing only for the innocent victims of trade disputes, the conclusion is inevitable that the *union* office workers are disqualified from receiving benefit payments. The facts clearly demonstrate that their unemployment was not involuntary in the sense demanded by a realistic application of the "volitional" test "based upon a just analysis of a substantial subjective element." The record indicates that as members of Local 230, UAW, the union claimants were involved in a labor dispute with petitioner and that a demand for a revision of the contracts of employment between petitioner and all categories of its employees was the crux of this dispute. By its representation on the national negotiating committee, Local 230 directly participated in the bargaining negotiations and it is undisputed that it had a direct and material interest in the successful outcome of these negotiations. In August of 1949, the union office workers voted to strike if necessary to enforce their demands for more favorable contract terms. However, as a matter of strike strategy and as a tactical maneuver in the contest between employer and union, the national leadership of the UAW exercised the authority with which it was vested by calling a strike only of the production workers. This decision was obviously dictated by the fact that such a tactic would not only bring to bear the maximum of economic pressure against petitioner in the struggle to attain the objectives in which all the workers were interested, but would result in a minimum of economic hardship and dislocation to the other workers. The union office workers voted to conform to this decision of its officers, and thereafter continued to work although they were fully aware that the strike, simultaneously called, of the production workers would strangle operations and squeeze to a trickle the

amount of work available for them. In participating in the events leading up to the strike, in supporting the tactical decisions made by their union officials empowered to conduct negotiations and formulate strike policy, in acting in concert with the production workers at all stages of the controversy, and, through identical union representatives, permitting the use of a production workers' strike as the instrumentality for the effective implementation of the overall strike strategy, it is manifest that the union office claimants were protagonists in a struggle involving a calculated risk of paralyzing petitioner's operations before the new contracts, of which they would be beneficiaries, would be consummated.

That this identity of interest and concert of activity between union office and production workers was indeed a vivid reality unmistakably appears from a bulletin which was placed in evidence. The bulletin was issued by the executive board of Local 230 and circulated at the main gate of petitioner's plant. Its salient provisions are:

"*Why didn't the office workers strike?* Policy decisions were made by a national conference of Chrysler workers in Detroit. Office workers had their representatives there from most of the big plants in Detroit. It was decided at this conference that stopping of all production by production workers and stopping of development for the '51 models by the engineers would force a quicker settlement by Chrysler. The 'pulling' of the office workers would not materially hurt the corporation and would prevent hourly people and engineers from receiving pay due them. For these reasons it was determined that office workers would not strike 'at this time.'

*Will office workers be affected by the outcome of this strike?* Office workers have just as much, if not more, to gain by this strike than do other workers. Besides the direct economic issues that are at stake for all Chrysler workers, there is also the question of equalization of rates and classifications with Detroit, the question of automatic salary progression versus so-called 'merit and ability' increases, the question of tying down vacation and holiday payment, etc. Chrysler will never offer these changes on a silver platter. We have to scrap for them."

It is unmistakably patent that we are confronted here with an ingenious attempt of a group of workers to promote the demands of their union by choosing a weapon, in a trade dispute concerning all union workers, potent enough to annihilate the employer's efforts to maintain its operations, while

adopting the position that union members, laid off by the employer's enforced suspension of activity, are unemployed through the fault of the employer.

Appellants argue that section 56(a) must be construed in the simple terms of the objective phraseology used, so that unless a worker "left" his employment because of a trade dispute, he is eligible for benefits. As indicated above, this is not the view taken by our courts. An example of the fallacy of this sterile, "last act" interpretation here contended for is presented by the decision in *McKinley* v. *California Emp. Com.*, 34 Cal.2d 239 [209 P.2d 602]. In that case, an employers' association of wholesale bakers in Sacramento was engaged in negotiating a new industry-wide master contract with the Bakery Workers' Union. The employers' association had been formed in 1935, and since then had entered into work contracts with the union, whose local represented all the workers in the area. The association had agreed that a strike against any employer "would be treated" as a strike against all. The employee union members understood that a strike called against any member of the association would probably result in the other bakeries closing down. During the negotiations initiated by the union to amend the master contract the union members authorized a strike at one° or more of the bakeries. When negotiations collapsed, the union called a strike against a single member employer and stationed pickets at the struck plant. A few days later the other member employers closed their doors. The employees who were locked out applied for and were granted unemployment insurance benefits. On petition by the seven employers who had shut down for a writ of mandate to strike out the charges made to their unemployment insurance account, the court held that since the employees authorized a strike with full awareness of the possible consequences of shutting down one plant, they were voluntarily responsible for their subsequent unemployment. The court reiterated that "the form of the cessation of employment is not controlling and the determinative factor is the volitional cause of the work stoppage." (*McKinley* v. *California Emp. Com., supra*, p. 243.)

So compelling are the analogous features of the McKinley case to the question here under consideration and so helpful the text last quoted, that we consider the principles there applied serve to control the instant case. There the court recognized that where a union uses the tactical maneuver of a strike° against only one employer, and where a termination

of employment is reasonably foreseeable by the use of such strategy, the consequent unemployment of nonstriking workers who are members of the union must be regarded as voluntary. This is precisely the situation which, in the present case, could reasonably have been envisaged as a consequence of calling a strike of production workers whose uninterrupted employment was necessary to the functioning of the assembly plant. It may be remarked that in the McKinley case, the remaining employers were not impeded from continuing their operations by the strike called at one plant. In the present case, there is the stronger fact that the strike of the production workers brought petitioner's operations to a physical standstill. It would oblige us to completely ignore the realities to hold that the union office workers' employment was terminated by petitioner and not by a choice they themselves freely made by their participation in a labor dispute in which they and their representatives selected the economic weapons.

The question remaining relates to the eligibility of the nonunion office workers for benefits. In the light of the principles that govern this matter, the trial court erred in denying benefits to these claimants. So far as these workers are concerned, in no sense can it be fairly said that their unemployment can be attributed to any voluntary action on their part. At no time did they share in the strike vote, or have a voice in the union councils, or perform any overt acts that would place them in league with the union workers. At all times they crossed the picket lines not as a part of the union strategy, which they had neither consented to nor authorized, but as individuals in the normal pursuit of their jobs.

Their status is in no way compromised by virtue of the fact that under the provisions of the Taft-Hartley Act (61 Stats. 143 [1947], 29 U.S.C.A. § 159(a) [Supp. 1951]) Local 230, UAW is their collective bargaining agent. That Local 230 had this power is not the result of any act on the part of nonunion workers, but merely by operation of law, and this fact alone cannot be used to penalize nonunion workers by fastening upon them responsibility for the unemployment flowing from a chain of events sparked and set in motion by union policy. (*Rhea Mfg. Co.* v. *Industrial Com.*, 231 Wis. 643 [285 N.W. 749, 753].) The nonunion workers did not leave their jobs, nor did their unemployment result from any fully exercised choice in the course of industrial strife. As nonparticipants and neutrals in the strike whose loss of work was due solely to factors over which they had neither control

nor influence, the nonunion workers are not within the class excluded by section 56(a) of the Unemployment Insurance Act. As helpless and inarticulate pawns situated in the no-man's land of the area of combat between employer and union, they belong, rather, to that very group for whom the benefits of the act are provided to mitigate the financial rigors of idleness stemming from the accident of involuntary unemployment.

The judgment is reversed with directions to issue a writ of mandate ordering that all charges made to or against the account of petitioner because of unemployment insurance payments to union office workers of petitioner during the period April 19, 1950, to May 4, 1950, inclusive, be removed from the books of the California Employment Stabilization Commission.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied March 6, 1953, and appellants' petition for a hearing by the Supreme Court was denied April 7, 1953. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.