MARTIN SPROCKET & GEAR COM-
PANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 19463.

United States Court of Appeals
Fifth Circuit.

March 19, 1964.

Rehearing Denied April 22, 1964.

Winfred Hooper, Jr., George Q. Mc-
Gown, III, R. W. Decker, McGown, God-
frey, Logan & Decker, Fort Worth, Tex.,
for petitioner.

Dominick L. Manoli, Associate Gen.
Counsel, N. L. R. B., Marcel Mallet-
Prevost, Asst. Gen. Counsel, N. L. R. B.,
Melvin Pollack, Atty., N. L. R. B., Wash-
ington, D. C., Stuart Rothman, General
Counsel, Janet Kohn, Attorney, National
Labor Relations Board, Washington, D.
C., for respondent.

Before BROWN and BELL, Circuit
Judges, and SIMPSON, District Judge.

SIMPSON, District Judge.

Presented by the Petitioner, Martin
Sprocket & Gear Company, Inc., (herein-
after Martin) is a Petition for Review of
an Order of the National Labor Relations
Board (hereinafter the Board). We are
asked to set aside an Order finding Mar-
tin in violation of Section 8(a) (1) [1] of
the National Labor Relations Act by rea-
son of coercive interrogation of its em-
ployees with respect to their Union affilia-
tions and activities, and Section 8(a)
(3) [2] by discriminatorily discharging an

---

1. 29 U.S.C. § 158(a) (1).

2. 29 U.S.C. § 158(a) (3).

employee named Jefferson Davis King. The Board, having adopted the Trial Examiner's findings and recommendations, issued a Cease and Desist Order as to the 8(a) (1) and (3) violations and ordered that King be reinstated with back pay.

Petitioner's brief urges six assignments of error, which collectively can be summarized as follows:

The Order of the Board cannot stand because the Examiner's findings were erroneous, and, consequently, the conclusions so reached are not supported by substantial evidence.

As to the violation of 8(a) (1),[3] the Petitioner contends that the Order, holding a violation of this section had occurred, is violative of the constitutionally guaranteed right of freedom of speech. It is insisted by Martin that what its foremen and other officials said to several of the employees, concerning the possibility of a Union being started, was only an expression of their personal opinion; secondly, it is complained that there is lacking any evidence whatsoever to show that the interrogation of these employees was a concerted action on the part of Martin.

With respect to the violation of 8(a) (3),[4] Martin contends that the Order violates the right of an employer to discharge an employee for any reason for which it sees fit and under any circumstances reasonable or unreasonable, fair or unjust so long as it does not do so because of Union activity. In support of this, it is urged that such a finding is not based on substantial evidence.

Martin is a relatively small concern, having a day and night shift composed of some one hundred employees. The record indicates that the managerial staff was quite friendly to the employees. Martin sponsored a bowling team, and not infrequently, several of the foremen and the Vice-President participated.

During the early part of May, 1961, the discharged employee, Jefferson Davis King, together with two other employees, his brother-in-law, Billy Gene Clark, and one Josh Ray Allen, discussed the desirability of being represented by a Union.[5] After contacting a Union organizer, they tried to interest other day-shift employees in joining the Union.

On Monday, May 15, a Union representative waited at the gate to pass out Union authorization cards and other literature to the employees as they changed shifts. Prior to this distribution, but on the same day, Bill Howard, one of the foremen, approached Josh Ray Allen and questioned him concerning rumors of the employees trying to organize a Union. Howard told him, "I don't think that the company needs a Union out here. We don't want any rumors about one going on."

That Monday night was league night at the bowling alley. Several employees, including King, were warming up when Howard arrived. Howard asked how many of them had signed and sent in their authorization cards to the Union. While King announced that he had, the others evaded the question. Although jests about the Union were exchanged during the match, the employees all testified Howard appeared concerned and was quite serious when he asked them about who had signed authorization cards. On the other hand, Howard insisted he was only joking.

Terry Armstrong, an employee who worked in the main office, testified that

---

3. 29 U.S.C. § 158(a). "It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"
   29 U.S.C. § 157 provides, in effect, that employees shall have the right to self-organization.

4. 29 U.S.C. § 158(a) provides that it shall be an unfair labor practice for an employer—
   "(3) by discrimination in regard to hire or tenure of employment or any term of condition of employment to encourage or discourage membership in any labor organization."

5. United Steel Workers of America, AFL-CIO.

on the following day, May 16, he and Joe Martin, the President, discussed the Union's chances of succeeding if an election was held. He further stated that Joe Martin asked him how Jeff King felt about the Union. Terry said he avoided giving a direct answer.

On the next day, King was discharged. Before the Examiner, management witnesses, Howard and the managing Vice-President, Trout, testified that King was discharged because he was not giving them a day's work, that what he did was not up to par, and that he was accident prone. Other employee witnesses testified that these reasons were asserted to them by Trout and Howard shortly after the discharge.

King began his employment with Martin in 1955. Starting in December 1957 with an injury to his head, King suffered recurring disabling injuries up until 1960. These injuries necessitated periods of convalescence, the longest lasting for four months. It is undisputed that during the times King was recovering, Martin paid him his full salary. The company paid for medical expense, including psychiatric treatment. Howard testified that while he was dubious about the extent of King's injuries, he did encourage this sick pay and further, he arranged on King's return for an increase in King's wages. The company records indicate that from his last return in January of 1961, until his discharge on May 17, 1961, King was present almost every day and was not plagued with further injuries. From the evidence, King's discharge in 1960, after three years of intermittent injuries, would be readily understandable. But the evidence demonstrates just the opposite in that, as mentioned above, he received a pay raise and in addition was given progressively lighter work. The discharge came swiftly after his Union interest was made known to Martin.

In opposition to the Order charging violations of Section 8(a) (1) and 8(a) (3), Martin's main contention is that the Secretary has not produced even a scintilla of evidence to support either charge, and that the Petitioner, while under no duty to come forth with any evidence of its innocence, has adequately shown through the testimony of its President, Vice-President and foreman that the inquiries made among the employees were expressions of personal views only and that valid grounds were present for King's discharge. That Petitioner complains that the testimony of these officials was arbitrarily disregarded by the Trial Examiner and likewise by the Board, which adopted the Examiner's findings and conclusions.

This contention will not stand critical examination. To the contrary, the record contains ample testimony by King, Allen, Armstrong and Runyon countervailing Martin's evidence. In addition to the live testimony of the several employees, the history and background of the controversy raise strong inferences of concerted company action in restraining and interfering with employees as to their Union activities and affiliations, and of a discriminatory discharge of King.

It is undisputed that the president and other members of management questioned different employees and expressed the company's viewpoint against Unions.

On May 17 Jefferson King was discharged. Three weeks after this discharge, and a week before a representation election was scheduled, another foreman, Andy Anderson, had a discussion with an employee in which he stated that "as far as he was concerned the Unions just stink."

Most of these incidents, including the sort of Gallup poll Howard took before the election, if viewed in isolation, would not indicate a violation of Section 8(a) (1). But collectively, the evidence supports a finding that they were part of a concerted effort on the part of the Martin management to interrogate employees concerning their attitude towards and activities on behalf of the Union under circumstances which were inherently coercive.

Interference, restraint and coercion within the meaning of the Act depends upon the facts and circumstances of each individual case and our inquiry must be directed to the evidentiary basis for the Order of the Board. N. L. R. B. v. Harbison-Fischer Manufacturing Co., 5 Cir., 304 F.2d 738; N. L. R. B. v. Griggs Equipment, Inc., 5 Cir., 307 F.2d 275; N. L. R. B. v. Elias Brothers Big Boy, Inc., 6 Cir., 325 F.2d 360.

An employer may have a legitimate purpose of merely seeking information which makes it permissible as free speech under Section 8(c) (Title 29 U.S.C. § 158(c)). However, Martin had no legitimate reason to ferret out its employees' affiliations, and while questioning these men it offered no assurance against reprisal. Such questions about their Union sympathies and activities could well tend to influence the employees and were not permissible as free speech under Section 8(c) of the Act, as they were not the expression of a view, argument or opinion as there contemplated. Cf. N. L. R. B. v. Harbison-Fischer Mfg. Co., supra.

The record fully supports the Board's finding that the discharge of King constituted a Section 8(a) (3) violation. It is settled that credibility of witnesses and reasonable inferences to be drawn from the evidence are matters for determination by the Board. N. L. R. B. v. Tru-Line Metal Products Co., 6 Cir., 324 F.2d 614.

Martin fails to demonstrate that the testimony of the management was arbitrarily disregarded. It was substantially contradicted by the testimony of King, Armstrong and Runyon. The Trial Examiner was faced with the routine duty of factfinders to decide factual disputes. Substantial evidence was present to support either version. Such a situation was discussed by the Court in Metal Blast, Inc. v. N. L. R. B., 6 Cir., 324 F.2d 602, in which it was stated:

"The Board was thus presented a factual question. It found that the company's assigned reason for the discharge was a pretext and that Thompson was discharged because of his protests that the layoffs should be based on seniority. It was the function of the Board to determine the real reason for the discharge and whether the reason given by the employer was a pretext. * * * In doing so, it was entitled to draw reasonable inferences from the proven facts. Such inferences, if supported by the evidence as a whole are to be accepted by the Court, even though a contrary inference is possible and would have been drawn by the Court."

N. L. R. B. v. Robbins Tire & Rubber Co., Inc., 5 Cir., 161 F.2d 798; N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829; N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305.

In the case of N. L. R. B. v. Byrds Mfg. Corp., 8 Cir., 324 F.2d 329, where the parties had both presented plausible arguments why the employee had been discharged the Court declared:

"The trier of fact must choose between these two. Again its decision, although always outrageous to the losing party and hard for it to accept, is, if supported by an adequate evidentiary basis, not to be retried by this court."

The Board's choice in the case at bar was between two fairly conflicting views, and it is not the Court's function to displace it, even though the Court could justifiably have made a different choice had the matter been before it de novo. N. L. R. B. v. Walton Mfg. Co., supra.

The Board was entitled to weigh, and to draw reasonable inferences from, the circumstances surrounding King's discharge. To recapitulate: King had been employed by Petitioner for more than five years when, within a week, he (1) joined in initiating an effort to bring the Union into Petitioner's previously unorganized plant; (2) actively solicited his fellow employees to support the Union drive; (3) publicly proclaimed his Union

membership in response to his supervisor's inquiry; and (4) was summarily discharged. This dismissal differed so markedly from Petitioner's previous treatment of King, it seems that on the record the Board could reasonably find, as it did, that there was more than coincidence between the beginning of King's Union activities and his discharge. Cf. N. L. R. B. v. S.S. Coachman & Sons, Inc., 5 Cir., 203 F.2d 109; N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883.

For the foregoing reasons, we find that the Board's Order is supported by substantial evidence, and, accordingly, it is enforced.