SALINAS VALLEY BROADCASTING CORPORATION and/or Central California Communications Corporation, d/b/a KSBW–TV, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 18852.

United States Court of Appeals Ninth Circuit.

July 8, 1964.

Jacob Abramson, Salinas, Cal., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, James C. Paras and Glen M. Bendixsen, Attys., N.L.R.B., Washington, D. C., for respondent.

Before BARNES, HAMLIN and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

Salinas Valley Broadcasting Corporation (hereinafter referred to as "Salinas" or petitioner) brought this proceeding to review and modify a decision of the National Labor Relations Board, reported at 140 N.L.R.B. 852 (Case No. 20-C.A.-2228), finding that Salinas had been guilty of unfair labor practices by violation of §§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act,[1] in coerc-

---

1. Title 29, United States Code, § 158(a) (1) and (3) read as follows:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assist-

ed by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit, covered by such agreement when made and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to re-

ing and influencing employees in the exercise of certain rights, and in terminating the employment of Mark St. John, Cletus (Clete) Toone and Robert Erickson, so as to discourage membership in a labor organization.

Originally, petitioner had been charged with unlawfully terminating the employment of three additional employees—Pearlman, Chambers and Tidey. The charges as to their alleged unlawful termination were recommended to be dismissed by the trial examiner. The Board, by its decision and order dated January 25, 1963, affirmed both rulings of the trial examiner, with one minor exception not here relevant.

The basis of the alleged unlawful discharge was that Toone, St. John and Erickson were discharged because of their union activities.

The alleged errors are, as we slightly capsule them:

(1) There exists no substantial evidence to support the Board's Findings, Decision and Order.

(2) The findings that Salinas, by "interrogation" or "implied threat" influenced or coerced its employees is not supported by substantial evidence, and are contrary to law.

(3) Dismissing of charges as to Tidey, Chambers and Pearlman is inconsistent with refusal to dismiss charges as to Toone, St. John and Erickson.

The alleged improper discharges took place in Salinas, California. Petitioner is clearly engaged in commerce within the meaning of the Act. This court has

jurisdiction under Section 10(e) and (f) of the Act. 29 U.S.C. § 160(e) and (f).

We first note that Mr. Cohan was president of petitioner and chief executive; and Mr. Logan was supervisor of radio announcers and engineers.

The chronology of this case is of importance. Of the six employees named, five were discharged on the following dates: Pearlman, January 22, 1962; Chambers, January 26, 1962; St. John, Toone and Erickson, February 7, 1962. All but Erickson, a photographer, were radio announcers-engineers.

It is undisputed that just prior to February 1, 1962 there had been discussion *between employees* with respect to the organization of a union by the six non-organizational announcers, St. John, Turney, Pearlman, Tidey, Davies and Toone.

Tidey, Turney and Davies were never discharged. Davies and Turney left of their own volition. Pearlman was discharged on January 22nd, and in the judgment of the trial examiner and the Board, his discharge was for cause. St. John and Toone were discharged on February 7th, 1962.

Chambers, who had attended the second meeting December 30, 1961, did not attend the third on January 17, 1962, and never signed an authorization card either for NABET or AFTRA.[2] He was discharged January 26, 1962, and in the judgment of the trial examiner and of the Board, his discharge was for cause.

The fundamental question before us is whether there was substantial evidence, when viewing the record as a whole, to support the trial examiner's findings

scind the authority of such labor organization to make such an agreement: *Provided further*, that no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons

other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *."

2. These were the two possible unions involved. NABET was an abbreviation for the National Association of Broadcast Engineers and Technicians; and AFTRA was an abbreviation for American Federation of Television and Radio Artists.

(there being no other or further findings made by the Board),[3] that St. John, Toone and Erickson (the three discharged February 7, 1962) were improperly discharged.

We conclude the necessary substantial evidence does not exist in the record, and therefore that the decision is contrary to law, and must be set aside, and the amended complaint dismissed.

We could simply announce such a conclusion and dispense with the balance of this opinion. We think the parties, the trial examiner and the employees are entitled to know our reasoning.

Counsel for the Board assert that "the facts set forth in the statement *amply demonstrate* the propriety of the Board's findings that petitioner attempted to frustrate its employees' designation of AFTRA as their bargaining agent by ridding itself of AFTRA adherents, and to that end petitioner discharged employees St. John, Toone and Erickson."

This planned course was "revealed", says the respondent, in petitioner's attempt to identify the participants, and through "repeated interrogations" and "threats of economic reprisals."

The mere act of questioning employees concerning union membership is not unlawful in itself. S. H. Kress & Co. v. N.L.R.B., 9 Cir. 1963, 317 F.2d 225. We know of no statute or rule of law that prevents an employer from properly "ascertaining" whom among its employees are seeking to unionize the business.[4] The test is whether what is done by the interrogation interferes with the employee's protected rights. It is the method used; the circumstances existing at the time; and what the employer thereafter does, that is material to proof of illegal action. Management is not interdicted from "ascertaining" which employees want a union. The charges management must answer are whether: (1)

it interfered with, restrained or coerced employees (§ 8(a) (1)); (2) it discriminated in regard to tenure of employment (§ 8(a) (3)).

Respondent would have us equate "repeated interrogations and threats of economic reprisals" (Brief, [4a] p. 16) with the language of the statute—"interfere," "restrain," "coerce" and "discrimination."

Before we determine if such equation goes beyond reasonableness, we examine the factual support for the conclusionary statements in the Board's brief that there were "repeated interrogations" and "threats of economic reprisals." In the record, we find extremely slim reeds upon which the Board must rely.

In seeking facts to support the conclusion there were "repeated interrogations" we find:

(a) Cohan, the president of petitioner, questioned Coleman (Brief, p. 17), a management official. On three attempts Cohan elicited no information from him. This was no interrogation of any "employee."

(b) Cohan's questioning of Turney; Turney told Cohan the announcers felt "insecure" because the Christmas bonus was not as large as they desired. (Tr. p. 324.)

(c) Cohan complained through Logan to Pearlman (after the latter was discharged, and on January 31, 1962) that there were trouble makers in the organization, and referred to St. John, Toone and Williams as "stabbing him in the back." This was no interrogation.

Thus but one interrogation of an employee (Turney) took place.

As facts to support the conclusion there was "threat of economic reprisals," we find three facts:

(1) Cohan wanted Coleman to understand if the employees chose a union,

---

3. No question is herein raised by three employees who were found to have been discharged for cause. We assume there exists the required substantial evidence to support that finding.

4. Martin Sprocket & Gear Co. v. N.L.R.B., 5 Cir., 1964, 329 F.2d 417.

4a. "Brief," as used herein, refers to the Respondent Board's Brief.

they would be responsible for a "greater level of efficiency." (Brief, p. 17.)

(2) Cohan told Turney "if he [Cohan] had a union that we would lose out on some of the benefits." (Tr. p. 325.)

(3) Eleven days after Pearlman was fired, Logan told him Mr. Cohan had heard Pearlman "was a troublemaker," and was "trying to stab him in the back," and if this was not true, Pearlman should tell Cohan, "because Mr. Cohan has a lot of influence and could help me find a job." (Pearlman told Cohan nothing, went to Cohan for help in getting a job after his firing, and was aided in obtaining a job by Cohan.)

■■■ The first alleged threat of economic reprisal was made from management to management; if it was a threat at all, it threatened more efficient work and nothing more. The second can be characterized under case law as a threat of economic reprisal against an employee. Cf. National Labor Relations Board v. Elias Brothers Big Boy, Inc., 6 Cir. 1963, 325 F.2d 360, 365. However, we must remember the employer's right of free speech is still protected under the Act. 29 U.S.C. § 158(c). National Labor Relations Board v. Cosco Products, 5 Cir. 1960, 280 F.2d 905, 908. The third was advice, and it proved to be neither economic reprisal, nor threat of it, in fact, just the opposite—economic aid to an employee by management was established.

But counsel for the Board urge us to find that (a) the alleged "repeated interrogations," (b) plus the single "threat of economic reprisal," when added to (c) "anti-union conduct"[5] proves (1) an "avowed hostility to union representations, (2) resort to threats of reprisals against employees supporting the union, (3) persistent efforts to identify every union adherent, and (4) 'abrupt termination' of hitherto praised employees who represented the last vestige of employee support for the union."

We cannot agree that this is an accurate or a fair summation of the evidence before the trial examiner. And thus far we have considered only those evidential facts favoring the examiner's rulings.

Nor can we say the facts are here comparable with those detailed in the principal cases relied on to support the Board's conclusion that union activity precipitated the discharges.

(a) In Angwell Curtain Co. v. N.L. R.B., 7 Cir. 1951, 192 F.2d 899, 901–903, employee Thomas was seen soliciting signatures on union cards in the parking lot; was discharged the next day, that her discharge was final "according to the outcome of this thing that has started" ("this thing" meaning the organization of the union), and four or five days later, when she asked why she had been discharged, she was told "Now, Stella, you know why." She was told there were no complaints about her work, and when she asked if her firing was permanent, was told: "Wait until this thing is over." Management thereafter stated the twenty-one employees who had voted for the union "would be weeded out"; that if there was a union the plant would close; that anyone who had anything to do with a union would not be re-employed.

Thus in Angwell there existed *no reason* to discharge Thomas, save her union activities; and the subsequent bare statement of management that she was not discharged because of her union activities naturally carried little or no weight or conviction with the trial examiner; and properly so.

(b) National Labor Relations Board v. Radcliffe, 9 Cir. 1954, 211 F.2d 309, 313, cert. den. 348 U.S. 833, 75 S.Ct. 56, 99 L.Ed. 657. Here four permanent employees, and one temporary employee, had each signed union cards within the previous two weeks. Two of these employees had previously been complimented in their work. One ninety days before, and

---

5. This anti-union conduct was itself based upon two incidents; each involving the use of intemperate language—once by Logan (Tr. pp. 117–118) (who referred to the union organizers trying to "come into the station" as "dirty s.o.b.s"); and once by Cohan, who referred to unnamed "trouble makers" and accused three employees of "stabbing him in the back."

one thirty days before, had been given an increase in salary. Summarily, and without warning, in a period of five days, all five were fired—two allegedly because they did not see "eye to eye" with the company, one because he "did not seem to be in sympathy with the Company;" one because he "was not in sympathy with the Company and was not satisfied with what he was earning;" one because he had asked for increased pay, and hence "must be dissatisfied with his job." Upon advice of the company's attorney, two were rehired, despite their written statement they still preferred a union to represent them.

Before the Board, the respondent company gave "various, inconsistent reasons" for the various firings: (a) that two were still employed; (b) that the employment of one had only been temporary; (c) that two had voluntarily quit, without notice.

(c) National Labor Relations Board v. Tru-Line Metal Products Company, 6 Cir. 1963, 324 F.2d 614, cert. den. 377 U.S. 906, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964). Here, (324 F.2d p. 616)—

> "The Board found that these two employees were the chief protagonists of the union; that their activities among their fellow employees were extensive and unconcealed; that the plant was small and had only thirty-six employees, with about thirteen on the day shift constituting the largest group working at any one time; that the two discharged persons were among respondents' most highly qualified employees; that one of the discharged employees had the greatest seniority, was the highest paid, and was the most versatile of all the female employees; that the other discharged employee had greater seniority than many others and had been granted two recent increases in wages; that the two employees were discharged suddenly, without any previous warning or reprimand for unsatisfactory work or conduct; and that, while respondent undertook to justify the discharges upon the ground of lack of work, the workload in fact had increased about that time, requiring more overtime work.

> "We find that the Board was justified in concluding from these circumstances that these two employees were discharged discriminatorily because of their activities in support of the union."

(d) Martin Sprocket & Gear Company, Inc. v. N.L.R.B., 5 Cir. 1964, 329 F.2d 417:

> Here petitioner was described "as a relatively small firm"—(having twice the employees petitioner Salinas had). Here union cards were passed out at the gate of the plant premises by a union organizer. One man (King) was discharged. He was the one man who admitted to management he had signed a union card. He had worked five or six years with the petitioner. While he had been seriously injured at work in 1957 and received much medical care and treatment, he had worked steadily without loss of time for five months, and had received an increase in pay.

All the specific interrogations made by management, and all statements made by them allegedly showing an anti-union background, are not recited in detail in that opinion (cf. 329 F.2d p. 419). One statement quoted was made subsequent to the firing: "Unions just stink." While this is the only detail set forth, the opinion states: "[T]he record contains ample testimony by King, Allen, Armstrong and Runyon countervailing Martin's evidence." (Martin was petitioner's president.)

And as the opinion points out, the testimony of the management "was [not] arbitrarily disregarded. It was substantially contradicted * * *." (329 F.2d p. 420.)

But as Martin Sprocket also inferentially holds, a comparison of adjudicated cases is of little value.

> "Interference, restraint and coercion within the meaning of the Act depend upon the facts and circum-

**610**

stances of each individual case and our inquiry must be directed to the evidentiary basis for the order of the Board." (citing National Labor Relations Board v. Harbison-Fischer Mfg. Co., 5 Cir. 1962, 304 F.2d 738.) Cf: Judge Wisdom's dissent. National Labor Relations Board v. Griggs Equipment, Inc., 5 Cir. 1962, 307 F.2d 275; National Labor Relations Board v. Elias Brothers Big Boy, Inc., supra.

■ We have no quarrel with the principle that "questions of credibility were for the examiner." We fully agree. Cf: our opinion in National Labor Relations Board v. Mrak Coal Co., 9 Cir. 1963, 322 F.2d 311, 313.

Despite the fact that on the same record the reasons given by petitioner for the discharge of Pearlman and Chambers were found valid and proper by both the examiner and the Board, we are asked to affirm a conclusion that the reasons given by the petitioner for the discharge of St. John, Toone and Erickson are invalid because they "were exposed as false." (Brief, p. 22.)

To properly weigh the evidence before the trier of fact; to determine how much weight should be given the examiner's opportunity, which we do not have to judge the credibility of witnesses; and to ascertain how closely the facts of this case, proved on behalf of petitioner, do or do not resemble those of the Angwell Curtain, Radcliffe, Tru-Line Metals Products and Martin Sprocket cases cited above, supra, and relied upon by respondent, we must consider not only the facts urged by respondent, but also those contradictory facts relied upon by petitioner in coming to the conclusion he had the right to discharge the employees. They are these:

(1) *St. John.* This radio announcer had been employed since May 1960, some twenty-one months. On February 7, 1962, he was dismissed because he had used "the Station credit account without authorization"; and because what he had done was "unethical." in his own words: "I had gotten a room for a friend of mine and his girl at the Wonderlodge Motel. I was using KSBW's name," because he had no money. His employer told him "the newspapers would love to get hold of something like this," and mentioned some "cablevision" matter in Monterey as one example of "newspaper trouble."

The person for whom St. John had obtained the room "in the name of KSBW" (Tr. p. 147, R. 25) and on the station's credit, was "a person of considerable prominence," a married man, and the girl was not his wife. This incident occurred at 3:00 A.M. on the morning of January 20, 1962. St. John returned later that morning to pick up his friend, at which time the girl had already left. In signing for the room, St. John gave a false address.

When St. John's services were terminated, St. John admitted that Mr. Cohan told him that he (Cohan) was required by this incident to let St. John go; that it might cause the station much embarrassment if the papers got hold of it, and that "I [Cohan] can't afford to take any chances." (Tr. p. 150.)

Mr. Logan knew of St. John's motel arrangement on January 22, but kept it from Cohan until the motel bill was about to come into the station, addressed to KSBW, around the first of the month, perhaps on January 29th. Respondent urges this shows management's "indifference" to St. John's conduct; Logan explains that he was trying to "protect" St. John.

Mr. Cohan also asked St. John if he had relieved Toone one night without clearing such relief through management. Mr. St. John admitted he had. The date of the unauthorized relieving was January 31, 1962.

(2) *Toone.* This radio announcer-engineer had been employed since January 1961, some thirteen months.

On January 30, 1962, he was admittedly absent from his transmitter. Logan testified that Toone had left before 10:30 P.M., and returned at five or six minutes after 11:00 P.M. This was immediately reported to Cohan, and Cohan decided

Toone should be replaced. (Tr. p. 432, lines 1–10.) Toone was told he was discharged because "by his absence from the transmitter, he had put the company's broadcasting license in jeopardy with the F.C.C."

Toone insisted he had obtained permission from Logan and one Ferlisi, a supervisor (each of whom represented management) through Ed Turney, a non-management employee. It developed Toone had left his transmitter on three occasions; January 17, January 24 and January 30th. At best, any permission obtained was extremely limited in scope—specifically to a few minutes on January 17th, and generally by regulation, of only enough time "to get a drink of water or to go to the rest room." [6]

There was also evidence Toone had signed off at midnight, December 31, 1961, fifteen minutes before he was supposed to according to the station's log book [7] introduced in evidence as Respondent's Exhibit 6. Toone claimed Logan had given him authority to make his time "arbitrary," but admitted Logan had called "immediately after" Toone left the air, and asked him *why* he had not stayed on the air; and that Logan had reprimanded Toone for his action the next day.

Toone also admittedly had changed shifts with St. John. It was also established management had issued instructions to warn Toone (based on a January 12 staff memorandum) with respect to not being available to make entries on the log when T.V. engineers called to the station from T.V. monitor points. (Tr. p. 430.)

Toone had also admittedly falsified the station's "log," and had been negligent in noting changes in the "directional patterns" of the station.[8]

6. Toone claimed at the hearing he had permission to take off once a week, but made no mention of this claim in his original report to the National Labor Relations Board investigator.

7. The log book, according to the testimony and the record, is required to be maintained by every licensed station and to be kept available to F.C.C. examiners.

8. "The change of pattern is accomplished in the Control Room by the radio announcer-engineer on duty. So-called monitor point readings are made once a week; that is to say, once a week someone, usually an engineer, goes out up to the transmitter site and makes a notation of the daytime or nighttime readings, as the case may be, showing the precise time when the pattern was changed. He notes the time (readings) in a log and the times of these readings should coincide with the time when the pattern is supposed to be changed by the radio-announcer-engineer in the control room at the station.

"As radio announcer-engineer on duty, it was Toone's duty to change the pattern at the precise time required by the FCC. What Cohan had reference to was the fact that a comparison of the entries made by Toone in his log, as showing the time of the change of pattern, were found not to coincide with the time entered by the monitor at the monitor point. It was found that the monitor point reading on a number of occasions was made up to half an hour later than the pattern should have been changed, whereas an examination of Toone's entries showed he had made the pattern change at the correct time.

"Toone's entry proved to be a false entry. He had actually made the change of pattern late but falsified his entry so that it would show he had done it on time. (This is illustrated by Resp. 7A and 29.)

"The falsity of these entries and their seriousness was explained by Hargan in the course of his testimony which appears at pages 593, ff, 633 and 781 of the Transcript. When confronted with the entries, Toone admitted what he had done. 'Mr. Hargan was completely correct; he is a very honest man. It is quite true. I did not make the changes as planned.' (T. 769, L. 19–20) Asked by the Trial Examiner whether he was aware of the gravity of his failure to change the pattern, he said 'Yes, sir, I was,' but went on to state it was unintentional, that he was busy with other things, and that he falsified the entry 'in order to protect the station's license.' 'You see the FCC rules and regulations require I make it a certain time. I didn't make it that time, but I logged it at that time * * *' (T. 772, L. 3–6) When asked by the Trial Examiner how many times he did this he said 'I would say about three or four times. It might have happened once or

In addition to the foregoing evidence, petitioner has asked us to consider two documents not in evidence before the examiner. Respondent has made no objection to our doing so. They are the decision and findings of the referee of the California Unemployment Insurance Appeals Board, in (a) the appeal of St. John from a department decision that claimant *had* been discharged for misconduct connected with his most recent work; (b) the appeal of his employer, "Salinas," from a department decision Toone *had not* been discharged for misconduct connected with his most recent work. In the first matter (SJ–00107) the department ruling was upheld; in the second (SJ–00277) the department ruling was reversed; in each case benefits claimed by the employee were denied.

■ Without holding that the *contents* of the documents are capable of being judicially noticed by this court, or accepting with any finality the facts recited therein, we can and do take judicial notice of the orders therein as proof that there could exist some substantial evidence either in the record or available on remand from which it could be inferred that employee misconduct, and not union activities, was the cause of St. John's and Toone's discharge.[9]

(3) *Erickson* was a photographer who had been employed since January 1961—some twelve months. By reason of his Navy experience he claimed to be an expert in still and motion picture cameras. His knowledge of the Mitchell camera was particularly important, because the station used an "Auricon" extensively and "anyone who could handle a Mitchell could presumptively use an Auricon."

To put the matter simply—Erickson in his work on the job proved to be less experienced and able than he professed to be when employed. He was asked to use the Auricon. He used the Auricon not more than five or six hours during his year's employment. In September 1961 he was asked to prepare a work study as to how he spent his time. It was in evidence (Respondent's Ex. 12) and showed he was not doing the work comparable to that done by Williams. Cohan had urged Erickson to take the Auricon camera out and try it. Erickson had, but only "on a couple of occasions" and used "just a small amount of film" (Tr. pp. 283–284). He admitted arguments or disagreements with the sales department staff on various matters.

Despite management's hope to end up with two photographers of equal ability, Williams and Erickson, Erickson produced very little in the way of "commercial account" films. According to Williams, in 1961 he remembers Erickson produced one film on Auricon with sound for a commercial account (Tr. p. 735, lines 16–20). During the same time Williams shot as many as two hundred (Tr. p. 736, lines 2–11). During this year, the film department had not justified its cost. There was talk late in 1961 about changes.

Cohan testified Erickson's work was "excellent" on processing film, but that Williams was carrying too heavy a load of what might be called the highly technical work, while Erickson was doing "the inconsequential" work. The two did not become interchangeable in their capabilities, as had been planned. As Cohan said, Erickson had not fallen down, "he just didn't develop and we were losing a lot of money on the department."

Erickson reportedly had told management late in 1961 he was "dissatisfied generally" with conditions and his salary. (Tr. p. 509.)

The witness Scott had found Erickson "arrogant" and "extremely uncooperative"—"quite uninterested"—in his job. When Scott requested "angles of shooting, and so forth" from Erickson, "he would walk away and leave me there with

twice more.' (T. 771, L. 20–21)." (Petitioner's Brief, pp. 41–43.)

9. Cf. California Unemployment Insurance Code, §§ 321, 322, 401, 407, 409, 410; and Chrysler Corporation v. California Employment Stabilization Commission, 1953, 116 Cal.App.2d 8, 253 P.2d 68.

my problem and still no answer." (Tr. pp. 546–548.) Because of this delay, Scott lost two accounts, Steitz Buick and Murray Vout, an automobile dealer. (Tr. pp. 549–550.)

Most if not all of the aforementioned weaknesses in Erickson's work had been demonstrated and talked about by management long prior to any union organizational activities on anyone's part.

From the foregoing brief summarization, it seems to us that clearly there was legitimate reason for discharging all three employees. We hold that not only was there a substantial conflict in testimony, but that the Board and the trial examiner went too far, looking at the record as a whole, in concluding that by "repeated interrogations," or "threats of economic reprisals," petitioner had interfered with or coerced its employees, or had discriminated against its employees by discharge.

There is no direct evidence whatsoever of any act or statement of the employer indicating dismissal for union activity. It is by inference alone that such a factual determination could be made in this case. In this respect it differs from the usual case.

No employee told Cohan that he wanted a union or that he had signed authorization cards for any union. There was no signing nor passing out of such cards on plant premises. There were no "meetings" on plant premises.

At the first secret meeting of non-management employees, St. John, Turney, Pearlman, Tidey, Davies and Toone were present. Only two were allegedly subsequently fired for union activities. At the second meeting, December 27, 1961, there were present the same six individuals. On December 30, 1961, at the third meeting, Pearlman, Tidey, Turney, Erickson, Williams, Barr and Coleman were present. Coleman wanted nothing to do with the plan, but of the other six, but one, Erickson, was allegedly fired for union activities. On the fourth meeting, January 17, 1962, Toone, Turney, Tidey and Erickson were present, two were found to have been fired for union activities; two were not.

There exists in the record no evidence whatsoever that Cohan knew of these meetings. He knew something was "up"—he repeatedly sought information—he never obtained it. To this day, there is no evidence Cohan knew who of his employees did, and who did not, sign union cards.

Thus we have participation in union activities by Turney, Tidey, Davies, Williams and Barr, and none of them were discharged. But Chambers, who had not participated in union activities, was discharged.

Because of the petitioner's loss in profits, there had been without question a serious reassessment of the business operations of the petitioner going on, prior to any thought or knowledge of union organization, in the minds of either employees or employer. A large number of personnel changes were made by the company about this time—some eighteen changes were allegedly discussed in December 1961 on an employees' list of fifty-three.

On a careful analysis of all evidence, considering the record as a whole, we hold the general counsel did not carry his burden of proof by establishing by a preponderance of the substantial evidence that the discharges here in question were motivated by an intent to interfere with, or restrict or influence, the employees' right to join or carry on activities on behalf of a union.

An unlawful intent is not lightly to be inferred. It cannot rest on remote or speculative evidence. National Labor Relations Board v. Citizen-News, 9 Cir. 1943, 134 F.2d 970. It should not rest upon an inference which itself rests on an inference.

"An employer may have a legitimate purpose of merely seeking information which makes it permissible as free speech under Section 8(c) (Title 29 U.S.C. § 158(c))." Martin Sprocket & Gear Co. v. N.L. R.B., supra, 329 F.2d at 420.

"Before inquiries as to union membership and statements by employers or supervisory employees can be held to be unfair labor practices, they must be shown to have some relation to the coercion or restraint of the employees in their right of self-organization." National Labor Relations Board v. Tennessee Coach Co., 6 Cir. 1951, 191 F.2d 546, 555.

"Interrogation of employees about membership in the union may or may not amount to coercion, depending upon the manner in which it is done and the surrounding circumstances." United Fireworks Mfg. Co. v. N.L.R.B., 6 Cir. 1958, 252 F.2d 428, 430.

"Interrogation of employees concerning their union activities may be suspect, but it is not per se unlawful." Wisdom, J., dissenting in National Labor Relations Board v. Harbison-Fischer Mfg. Co., 5 Cir. 1962, 304 F.2d 738, 741.

"[I]nfrequent, isolated and innocuous statements and inquiries, standing alone * * * [do not] constitute interference, restraint or coercion within the meaning of Section 8(a) (1) of the Act." National Labor Relations Board v. Armour & Co., 5 Cir. 1954, 213 F.2d 625, 628.

Neither mere inquiry by employer of employees, without harassment or undue frequency, as to the fact of the existence of a plan to unionize, nor a single somewhat vague prediction of anticipated loss of economic benefits can be transformed or transmuted by the magic of semantic labels into "repeated interrogations" or "threats of economic reprisals," sufficient to swing the balance against the other facts in the record.

The standards and principles of review expressed in the decision of the Supreme Court in Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474 at 490, 71 S.Ct. 456 at 466, 95 L.Ed. 456, are here particularly apt. There the Court, speaking through Mr. Justice Frankfurter, said:

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Court of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

Nor can this court escape its responsibility for following the rule laid down in Universal Camera, supra, by saying the examiner and the Board were entitled to infer that Cohan was not telling the truth; that their appraisal of his credibility and motives must be controlling—regardless of what other evidence is in the record. To follow this path would require us to abdicate all appellate responsibility in this type of case. We could not ourselves study and weigh all the evidence in the case, and come to our own conclusions as to the reasonableness and fairness of the decision. We respect the Board's findings—but not to the point of disregarding all or any of the evidence in the case, "when viewed as a whole."

We have not reached nor passed upon certain other positions taken by peti-

tioner, for they do not appeal to us as valid reasons for reversal, and we need not consider them.

Reversed and remanded with instructions to dismiss the amended complaint.