[Civ. No. 54940. Second Dist.. Div. Two. July 30. 1979.]

NATIONAL BROADCASTING COMPANY, INC.,
Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent.

**COUNSEL**

O'Melveny & Myers, Richard C. White, Scott H. Dunham, Clay M. Smith and Gordon E. Krischer for Plaintiff and Appellant.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and Louis Verdugo, Jr., Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**COMPTON, J.**—The National Broadcasting Company, Inc. (NBC) sought a writ of mandate in the Superior Court of Los Angeles County to require the California Unemployment Insurance Appeals Board (the Board) to vacate a decision awarding unemployment insurance benefits to certain of NBC's California-based employees. The superior court denied relief. NBC appeals. We reverse.

March 31, 1976, was the expiration date of the then current collective bargaining agreement between NBC and the National Association of Broadcast Employees and Technicians (NABET). The latter is a labor organization representing NBC's technical employees nationwide.

Negotiations on a new agreement began in February of 1976. NABET's strategy was to press for a new contract prior to March 31, 1976, in order to obtain leverage in its negotiations with other employers. When no agreement appeared to be forthcoming the Federal Mediation and Conciliation Service suggested extension of the current agreement to May 1, 1976, and a resumption of bargaining on April 19, 1976. NBC agreed but NABET rejected the proposal and called a nationwide strike against NBC on March 31, 1976, after giving NBC four hours notice.

Picket lines were established and NBC began to man its facilities with nonstriking personnel. During the ensuing days, incidents of sabotage of NBC facilities occurred across the country. None of the sabotage, however, occurred in California.

On April 2, 1976, the federal mediator advanced the date for resumption of negotiations to April 8. This earlier date was welcomed by NABET who then notified NBC by telegram that it was directing its members to return to work on April 7, 1976.

On April 6, 1976, however, NBC notified NABET that it would not agree to the return of the striking employees until it received certain assurances from NABET concerning the prevention of further sabotage

and a reasonable and certain period of extension of the present contract with its strike notice provision. NABET, although eschewing any connection with the sabotage, refused to give such assurances.

Acting on instructions from NABET, certain NBC employees began to contact NBC to obtain work assignments but were refused. On April 7, a group of approximately 15 NABET members attempted to report for work at the NBC Burbank facility. They were denied access by an NBC guard who referred them to NBC's telegram of April 6.[1] One NABET member reported to work at the San Francisco facility but was asked to leave upon the instructions of NBC supervisory personnel after working approximately 15 minutes.

NABET maintained its picket lines until a new labor agreement was executed by the parties on May 22. The employees returned to work on May 24, 1976.

During the period April 7 to May 24, certain of the striking employees applied for unemployment insurance benefits in California. The California Employment Development Department denied the applications on the basis that the applicants had voluntarily left work to participate in a strike.

The employees appealed that determination and, following an administrative hearing, the decision was that NBC's refusal to permit the employees to return April 7 made the latter eligible for benefits. The Board affirmed that decision.

Section 1262 of the Unemployment Insurance Code provides: "An individual is not eligible for unemployment compensation benefits, and no such benefit shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

The stated legislative purpose of the Unemployment Insurance Program is to reduce *involuntary* unemployment and to relieve the

---

[1] The employees who appeared were not reporting for their regularly scheduled shifts. It was stipulated at the hearing, however, that NBC would have denied them access in any event.

hardship on persons who *through no fault of their own* become unemployed. (Unemp. Ins. Code, § 100.)

■ Section 1262 specifically dealing with labor disputes, manifests the state's desire to maintain neutrality (*Matson Terminals, Inc.* v. *Cal. Emp. Com.,* 24 Cal.2d 695 [151 P.2d 202]) and not to require the employer to subsidize, through his contributions to the fund, the use of the strike as an economic weapon against him.

Case law applying section 1262 to various factual situations has developed along two general lines, i.e., cases dealing with the issue of the voluntariness of the employees' initial departure and cases dealing with the continuation of ineligibility after a voluntary departure.

In *Bodinson Mfg. Co.* v. *California E. Com.,* 17 Cal.2d 321 [109 P.2d 935], nonstriking employees who refused to cross picket lines of striking employees were held to have voluntarily absented themselves from their jobs. In a later case, *Bunny's Waffle Shop* v. *Cal. Emp. Com.,* 24 Cal.2d 735 [151 P.2d 224], where the employer "struck the first blow" by reducing wages and altering working hours in an effort to get the union to bargain with an employers' association, employees who walked out were found to be eligible for unemployment benefits because their leaving was considered to be involuntary.

After these early decisions came two cases dealing with strikes against selected employers by unions engaged in industry wide bargaining. *McKinley* v. *California Emp. etc. Com.,* 34 Cal.2d 239 [209 P.2d 602] and *Gardner* v. *State of California,* 53 Cal.2d 23 [346 P.2d 193], both held that in such a situation it was proper for employers to take a unified stance that a strike against one was a strike against all. Employees locked out by nonstruck employers were not eligible for unemployment benefits.

In tracing the development of the case law on the issue of whether the trade dispute is the continuing cause of the unemployment of workers who concededly left their employment voluntarily, the case of *Mark Hopkins, Inc.* v. *Cal. Emp. Com.,* 24 Cal.2d 744 [151 P.2d 229, 154 A.L.R. 1081], is an appropriate starting point.

Upon expiration of the collective bargaining agreement between a number of San Francisco hotels and the union representing the employees, the union took strike action against some but not all of the hotels.

During the ensuing period the union obtained employment for some of the striking employees in other hotels and restaurants which were unaffected by the strike.

Before the termination of the strike some of these individuals again became unemployed. They applied for unemployment compensation contending that although they left their original employment voluntarily their subsequent employment and unemployment eliminated the causal effect of the original trade dispute.

The court there stated that if a trade dispute is the direct cause of the continuing unemployment the claimant who voluntarily left his employment continues to be ineligible for benefits. The strike suspends the employer/employee relationship but does not terminate it.

Thus, it was held that if a striking employee obtains subsequent employment, the question of whether his ineligibility continues or is terminated depends on whether there is *a complete severance of the relationship with his former employer.*

In *Ruberoid Co.* v. *California Unemployment Ins. Appeals Board,* 59 Cal.2d 73 [27 Cal.Rptr. 878, 378 P.2d 102], the court addressed the problem of the point at which the striking employees' ineligibility terminates because of retaliatory conduct on the part of the employer. There the union admittedly "struck the first blow" by calling a strike. Thus, there was an initial ineligibility flowing from that action.

When the employer notified the employees that they had been discharged and permanently replaced by other personnel the original labor dispute was held to be at an end. The *Ruberoid* court held that ineligibility no longer existed because the continuing unemployment was not "caused" by the now terminated labor dispute.

This was a logical extension of the "severance of relationship" test described in *Mark Hopkins, Inc.* v. *Cal. Emp. Com., supra,* 24 Cal.2d 744.

The key feature in *Ruberoid* was the permanent replacement of the striking employees. This view is based on the following language in that case at page 82: "The employer here did not merely discharge the striking employees; it permanently replaced them and disrupted any relationship with them . . ." and is reinforced by the language and result in the later

case of *Isobe* v. *Unemployment Ins. Appeals Bd.,* 12 Cal.3d 584 [116 Cal.Rptr. 376, 526 P.2d 528].

In *Isobe,* after the employees struck, the union made an offer to return to work on condition that all employees be rehired. The employer, desiring to retain certain employees hired during the strike, refused to rehire *all* employees without specifying which ones or how many it would rehire. The court held that the continued unemployment of the striking employees was "caused" by the trade dispute and the ineligibility under Unemployment Insurance Code, section 1262 continued.

■ The rule in determining eligibility under section 1262 as synthesized from the cases is cast in the form of two questions: (1) did the employee voluntarily leave his employment as part of a trade dispute? and (2) is his continued unemployment the direct result of the continuance of the trade dispute? Determining the issue of whether the dispute continues to operate as the cause of the unemployment requires a further determination of whether the employee, as in *Mark Hopkins, Inc.* v. *Cal. Emp. Co., supra,* 24 Cal.2d 744, or the employer as in *Ruberoid* v. *California Unemployment Ins. Appeals Board, supra,* 59 Cal.2d 73, effectively severed the employer-employee relationship.

It is in this latter determination that the Board and the trial court in our case erred. Instead of focusing on the question of continuation of the employer-employee relationship the Board and the trial court adopted a rule which focused on the reasonableness and foreseeability of NBC's demand as a condition of permitting the strikers to return to work. This in effect involved the Board and the trial court in evaluation of the merits of NBC's position—an evaluation which is not at issue in these proceedings and not in keeping with the neutral position of the state.

For example, in its brief here, the Board argues that it was unreasonable for NBC to insist on assurances that sabotage be prevented because no sabotage had occurred in California. It also contends that it was unreasonable for NBC to insist on assurances of future strike notice because NABET had previously given advance strike notice.

Based on its perception that these demands were unreasonable the Board concluded that they were unforeseeable consequences of the original strike action.

We reject these arguments as specious. The fact that the sabotage did not occur in California is beside the point. NBC was negotiating with a single union on a nationwide basis. Its demand for assurance that sabotage would not be repeated need not have been confined to the geographical area where it had already occurred. Further, the fact that NABET had previously given advance notice of a strike did not require NBC to assume that such would always be the case in the future.

Beyond that, foreseeability is not the test. The Board's argument is apparently based on its misinterpretation of language to be found in *Gardner* v. *State of California, supra,* 53 Cal.2d 23. There the court, in describing the "volition-causation" rule stated: "As applied in the subject and cited cases the rule works impartially as to both employees and employers and puts each group on notice that the one which creates and first applies the economic weapon in a trade dispute . . . may have to bear responsibility for *foreseeable* reprisals." (Italics added.)

As pointed out earlier, *Gardner* involved the issue of whether locked-out employees were viewed as having left their employment voluntarily because the union representing them, although having declared an industry wide strike, actually ordered walkouts only at selected establishments. *Gardner* did not deal with the "continuation-causation" aspect of the problem.

The thrust of the case law is simply that when a union orders a strike it must anticipate that the employer will resort to some countermeasures. The collective bargaining process envisions demands and proposals by both employer and employee representatives.

It is clearly foreseeable that when employees elect to strike they will be unemployed for a period of time and that the employers will not automatically yield to every demand but will instead counter with their own demands for concessions.

To carry the Board's position here to its logical extreme would result in the Board injecting itself into the trade dispute as a judge of the merits of the positions of the protagonists. In a prolonged strike where the strikers applied for unemployment compensation benefits the Board would determine the issue of whether the trade dispute was the cause of the continuing unemployment by deciding on the one hand the reasonableness, and hence the foreseeability, of the employer's demands or on the

other hand the reasonableness of the union's demands and the foreseeability of the employer's refusal to meet them. This is directly contrary to the spirit and purpose of Unemployment Insurance Code section 1262.

■ Coming now to the case before us we find that there is no real factual dispute. Thus, we are not circumscribed in our review of the lower court's decision by any findings of fact. Our task instead is to determine as a matter of law whether under the undisputed facts the striking employees were eligible for unemployment benefits. (*Shoban* v. *Board of Trustees*, 276 Cal.App.2d 534 [81 Cal.Rptr. 112]; *Mark Hopkins, Inc.* v. *Cal. Emp. Com., supra*, 24 Cal.2d 744.)

NABET "struck the first blow" by ordering a strike of its members against NBC. The effort was nationwide and involved NBC employees at all of the latter's facilities. As of March 31, 1976, the striking employees were ineligible for unemployment benefits by virtue of Unemployment Insurance Code section 1262.

■ The sole question presented is whether NABET's offer to return to work on April 7, 1976, and NBC's conditional refusal effectively broke the causal connection between the trade dispute and the continued unemployment of the strikers.

It seems evident that the trade dispute was continuing and in active progress at NBC's facilities. The focus of that dispute was the nonexistence of a collective bargaining agreement. NABET struck at the expiration of the previous agreement. In so doing it took the position that its members would not continue to work in the absence of agreement. NBC's posture in refusing to permit the return to work was identical to that of NABET's previous position, i.e., "no agreement—no work."

In a collective bargaining agreement advantages flow to both sides. From the employer's standpoint the major benefit is stability in its work force and a certain foreseeability of freedom from labor strife and disruption. We see nothing unreasonable in employers adopting a position comparable to the union's position in regard to the desirability of a contract. NBC did not permanently replace the striking employees. Instead it indicated a willingness to rehire on certain conditions. It continued to negotiate with NABET on a new agreement.

For its part NABET clearly intended that its members would at some time return to their jobs, and, of course, they eventually did after executing a new agreement.

Thus it is clear that neither the employee nor the employer permanently severed the previous relationship. The employer-employee relationship and the trade dispute between them continued during the period March 31, 1976, to May 22, 1976. So then did the employee ineligibility under Unemployment Insurance Code section 1262 continue.

The judgment is reversed. The matter is remanded to the trial court with directions to enter a judgment granting NBC's petition for writ of mandate as prayed.

Roth, P. J., and Beach, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 26, 1979.