[Nos. A027251, A019154. First Dist., Div. One. June 24, 1985.]

PACIFIC MARITIME ASSOCIATION, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S
UNION, LOCAL 10, Intervener and Respondent.

**COUNSEL**

Lillick, McHose & Charles, Craig E. Epperson, D. Ward Kallstrom, David C. Culver and Ramon M. Gonzales for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Thomas Warriner, Assistant Attorney General, and Charlton G. Holland, Deputy Attorney General, for Defendant and Respondent.

Richard S. Zuckerman and Leonard & Carder for Intervener and Respondent.

## OPINION

**HOLMDAHL, J.**—This is a consolidated appeal from judgments denying petitions for peremptory writs of mandamus in two separate actions.

At issue is whether longshoremen, whose union initiated selective work stoppages in connection with trade disputes, may receive state unemployment compensation benefits, when they themselves did not participate in the stoppages in any way.

The judgments are affirmed.

### Statement of Facts

### A. *Background*

Pacific Maritime Association (hereafter, PMA) is a nonprofit association whose members include most employers of longshoremen on the Pacific Coast. PMA acts as the collective bargaining agent for its members. Local 10 of the International Longshoremen's and Warehousemen's Union (hereafter, Local 10) represents longshoremen in the San Francisco Bay Area.

PMA and Local 10 were parties to the "Pacific Coast Longshore Contract Document" for 1978-1981 and for 1981-1984 (hereafter, collectively, Contract Documents). These were collective bargaining agreements governing the terms and conditions of employment of longshoremen represented by Local 10 and employed by PMA members. They covered the time periods at issue in this appeal.

### B. *The Dispatch System*

In accordance with the Contract Documents, PMA and Local 10 have jointly operated a hiring hall in San Francisco. Its function is to dispatch

Local 10 longshoremen to employers according to a rotational dispatch system, which we describe below.

The system regulates those longshoremen who work in "gangs" (groups of longshoremen regularly working together under a "gang boss" on jobs lasting several days), as well as longshoremen operating individually (plug men), generally on one-day jobs.[1]

Each day, employers notify the hiring hall either directly or through PMA, of the numbers of longshoremen, either gangs or plug men, that they require, the job category, the vessel's name and location, and the starting time. No employer is permitted to contact longshoremen directly to offer them work.

Once the hiring hall receives an employer's request for a given day, it draws up lists of longshoremen to be assigned to a particular job category called "board." Priority is given to "registered" longshoremen—those registered with Local 10 and PMA—who are regularly available for work, as opposed to "casual" longshoremen who are not registered and work on an occasional basis. Preference is then given to gangs or plug men who previously have worked the fewest hours, in order to equalize work opportunities. A plug man's stated board preference also is taken into account.

The rotation system operates like a wheel. Each plug man is assigned a "line" number, which determines his position in the dispatch sequence according to his priority. Every day, he can call the hiring hall and listen to a recording which gives "start" and "stop" numbers for each board. The "start" number denotes the person with the highest priority, who is at the top of the dispatch list; the "stop" number denotes the last person to be dispatched in accordance with the employers' needs. If a plug man's line number falls within the "start" and "stop" numbers, he is "within the call" and will work that day.

As men are dispatched, the men with lower priority in the rotation sequence move up. Eventually each is at the top of the wheel or "within the call." After dispatch, he goes to the end of the line until it is his turn to work again.

Gangs are dispatched as a unit. A gang member determines whether his gang has been assigned to work by listening to the recording.

---

[1]While the system regulates the dispatch of most longshoremen, it does not apply to those relatively few longshoremen steadily employed by a particular employer.

Additional job opportunities occasionally arise. These becomes available in the following order: First, to longshoremen with a line number on a board that was not "within the call"; next, to other longshoremen, regardless of their board preference, including gang members whose gang has not been dispatched. After all available registered longshoremen have been dispatched, the hiring hall may fill any remaining openings with "casual" longshoremen. When the hiring hall is closed, employers fill their hiring needs through Local 10 agents who carry "hot sheets" listing longshoremen available for work.

Under the terms of the Contract Documents, a longshoreman's failure to make himself available for work when "within the call" results in loss of pay guarantee benefits provided by the employers. Longshoremen not "within the call" are not required to volunteer or to make themselves available for additional work in order to be eligible for such benefits, however.

### C. *The Claims*

*Action A019154.*

As a result of a dispute between Local 10 and PMA over the selection of longshoremen supervisors, Local 10 initiated a series of work stoppages at selected work sites beginning on December 29, 1979. An arbitrator ruled against Local 10; the union members refused to obey his order to return to work. On January 8, 1980, the United States District Court in San Francisco issued a temporary restraining order, followed by a preliminary injunction on January 11, ordering the Local 10 members to return to work. They obeyed the order.

Subsequently, 57 members of Local 10 filed claims with the Employment Development Department (hereafter, EDD), seeking unemployment compensation benefits for the period from December 29, 1979, to January 8, 1980. None of the claimants had participated in any way in the work stoppages; few had been aware of them. There is no evidence that they had been "within the call" to a struck worksite. They had not refused any work during the two-week period beginning December 29, 1979.

EDD ruled that a "trade dispute" within the meaning of Unemployment Insurance Code section 1262[2] had occurred, and that the claimants had left work because of that dispute. Hence, they were not entitled to benefits. An administrative law judge (hereafter, ALJ) reviewed the EDD decision. He

---

[2]All statutory references in this opinion are to the Unemployment Insurance Code.

dismissed the appeals of 23 of the claimants, none of whose claims is at issue here, and he affirmed the ruling as to the remaining 34 claimants. He found the claimants to be ineligible for benefits, because of their Local 10 membership and their participation in the dispatch system.

The Unemployment Insurance Appeals Board (hereafter, Board) reversed, with one member dissenting. It determined that "many" claimants had been unaware of the trade dispute and that their unemployment was not volitional, since none had refused to work. The claimants, therefore, were not ineligible for benefits.

PMA then petitioned the San Francisco Superior Court for a writ of mandamus ordering the Board to overturn its decision. The trial court initially issued, then discharged, an alternative writ of mandamus directing the Board to set aside its decision, so that, in essence it affirmed the decision of the Board in favor of the claimants. PMA filed a timely appeal.

*Action A027251.*

As a result of a trade dispute over work conditions and dock work assignment practices, Local 10 initiated work stoppages on November 28 and November 29, 1981, at the Encinal Terminal facility of Crescent Wharf and Warehouse Company, a PMA member. All Local 10 members at this facility, except special equipment operators, walked off the job during these two days.

An arbitrator held that the stoppages were illegal; the workers did not return to work. A second arbitrator ruled against Local 10 and, after his decision, business resumed as usual.

Eight Local 10 members filed benefit claims with EDD for the period of November 28 to December 4, 1981. None had participated in the work stoppages. Nonetheless, EDD determined that all Local 10 members, except special equipment operators, were disqualified from obtaining benefits for the period in question, whether or not they actually had participated in the stoppages. Thus, EDD ruled against the claimants.

An ALJ reversed the EDD ruling. He found that the claimants had not refused to be dispatched to work and had not participated in the dispute. One of them, Sun Y. Ang, would not in any event have been dispatched, given his board.

PMA appealed to the Board. It affirmed, stating that the claimants had not adopted the "stoppages as their own simply because they did not happen to volunteer their services . . ., which they had no legal duty to do."

PMA then petitioned the San Francisco Superior Court for a writ of mandamus directing the Board to set aside its decision. The trial court issued an alternative writ. After a hearing to show cause why the Board had not set aside its decision, the court discharged the alternative writ and denied PMA's petition. PMA filed a timely appeal.

On May 18, 1984, this court issued an order consolidating the appeals in the two actions, pursuant to the parties' stipulation for such an order.

## Issue on Appeal

■ The sole issue on appeal is whether the claimants may be denied unemployment compensation benefits on the ground that they participated in a "trade dispute" within the meaning of section 1262, when none of them walked off the job or refused work but none of them actively repudiated Local 10's work stoppage policy or sought the struck work.[3]

## Standard of Review

■ Generally, the superior court determines whether, on the basis of the record of the administrative proceedings, there is substantial evidence to support the findings of the administrative agency. On appeal, the appellate court then decides whether the trial court's findings and judgment are supported by substantial evidence. (*Lozano* v. *Unemployment Ins. Appeals Bd.* (1982) 130 Cal.App.3d 749, 754 [182 Cal.Rptr. 6].)

When, however, the facts before the administrative agency are uncontradicted, the trial court's determination involves only a question of law. Appellate review in such a case is based not upon the substantial evidence rule, but upon the independent judgment rule. (*Pacific Legal Foundation* v. *California Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 116, fn. 7 [172 Cal.Rptr. 194, 624 P.2d 244]; *Aantex Pest Control Co.* v. *Structural Pest Control Bd.* (1980) 108 Cal.App.3d 696, 701 [166 Cal.Rptr. 763]; *Swaby* v. *Unemployment Ins. Appeals Bd.* (1978) 85 Cal.App.3d 264, 269 [149 Cal.Rptr. 336] [disapproved on other grounds in *Pacific Legal Foundation* v. *California Unemployment Ins. Appeals Bd., supra*].)

---

[3]The present case arises under section 1262, which concerns *temporary* unemployment attributable to a trade dispute, rather than under section 1256, which pertains to *permanent* unemployment following resignation, layoff or discharge.

In the case before us, the facts are undisputed and the sole question on appeal concerns the application of section 1262. Accordingly, we treat the question as one of law and conduct an independent analysis.

*Analysis*

Section 1262 provides: "An individual is not eligible for unemployment compensation benefits and no such benefit shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

"The stated legislative purpose of the Unemployment Insurance Program is to reduce *involuntary* unemployment and to relieve the hardship on persons who *through no fault of their own* become unemployed. (Unemp. Ins. Code, § 100.) [¶] Section 1262 specifically dealing with labor disputes, manifests the state's desire to maintain neutrality [citation] and not to require the employer to subsidize, through his contributions to the fund, the use of the strike as an economic weapon against him." (*National Broadcasting Co.* v. *Unemployment Ins. Appeals Bd.* (1979) 95 Cal.App.3d 550, 554-555 [157 Cal.Rptr. 207], italics in original.)

Eligibility for unemployment compensation benefits under section 1262 is determined by a two-prong test: (1) whether the claimant voluntarily left his employment (volition); and (2) whether a trade dispute was the cause of continued unemployment (causation). (*Isobe* v. *Unemployment Ins. Appeals Bd.* (1974) 12 Cal.3d 584, 588-589 [116 Cal.Rptr. 376, 526 P.2d 528].) The determination is to be made in the context of the particular facts of a case. (*Ibid.*)

PMA argues that the claimants, having left work by virtue of a trade dispute, are ineligible for benefits. The volitional element is satisfied because the claimants had an identity of interest in Local 10's disputes with the employers and because, although the claimants did not expressly refuse to work, they also failed to repudiate their union's work stoppage policy or to seek employment available as the result of the work stoppages. As PMA has never been able to obtain replacements for Local 10 members who refuse to work because of a trade dispute, an inference that claimants who did not repudiate the work stoppages or seek additional employment would also have refused to work had they been "within the call" is not unreasonable. Finally, PMA argues that the causation element is also met because the work stoppages policy ultimately was responsible for the claimants'

unemployment. ▮▮▮ For reasons stated below, we reject PMA's arguments and conclude that the claimants are not ineligible for benefits under the requirements of section 1262.

The primary cases relevant to our review are *Matson Terminals, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 695 [151 P.2d 202]; *W. R. Grace & Co.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 720 [151 P.2d 215]; and *Chrysler Corp.* v. *California Unemp. Ins. Appeals Board* (1962) 199 Cal.App.2d 683 [18 Cal.Rptr. 843].

*Matson* and *W. R. Grace,* as well as a third case, *Am.-Hawaiian S. S. Co.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 716 [151 P.2d 213], are companion cases that were decided on the same day. In *Matson,* ship clerks who were members of a local union affiliated with the same international as the longshoremen's union, called a strike against steamship and stevedoring companies. Members of the longshoremen's union did not work for these employers during the strike, but claimed benefits. When the strike began, some claimants were working on unfinished jobs for employers against whom the strike had been declared; others were waiting at the hiring hall for their next assignment; and, still others were working for employers not involved in the dispute and did not stop working until they had completed their job assignments. Each claimant stated that he would not work during the clerks' strike; each refused to cross the clerks' picket line.

The court held that the claimants were ineligible for benefits. First, the court decided that whether or not each longshoreman had *actually* been working was unimportant: By virtue of his contractual arrangement he had a proportionate share of the work and therefore was to be considered employed even if he was not present at the worksite itself. Second, the court found that the claimants had *voluntarily* decided not to cross the clerks' picket line. Therefore, each had left work because of a trade dispute and was disqualified from receiving benefits.

Similarly, in *Am.-Hawaiian,* the court found that the members of the ship clerks' union who had abided by their union's call for a strike and had refused to work during the strike for any of the members of the employers' association against whom the strike had been called, had left work because of a trade dispute and were not entitled to benefits.

In *W. R. Grace & Co.* v. *Cal. Emp. Comp., supra,* 24 Cal.2d 720, the claimants were longshoremen who sought benefits for the period during which a strike by checkers and ship clerks occurred. The longshoremen fell into three groups: (1) Those who were told not to begin to work during the

strike unless they were willing to work without checkers or ship clerks; (2) those who went to work on ships but stopped at the stage when checkers were usually employed; and, (3) those told by their employers to return to the hiring hall. Those longshoremen dispatched to docks where checkers and clerks were not usually required, worked.

The court held that those longshoremen unwilling to begin work at all without checkers or ship clerks and those unwilling to continue without checkers, were ineligible for benefits under the reasoning of *Matson,* because checkers and clerks were not essential to their performance. (*Id.,* at p. 731.) However, those longshoremen told by employers to return to the hiring hall did not leave their employment because of a trade dispute, as they did not refuse to work without the presence of checkers and clerks. Significantly for the present case, the court said: "It appears . . . that some of the claimants were never dispatched from the hiring hall, although . . . orders for longshoremen were placed by the employers with the dispatcher at the hiring hall that were not filed. These *claimants are not disqualified . . . unless they refused to be dispatched,* in response to the employers' request for longshoremen *because they would not work without checkers.*" (*Id.,* at p. 733, italics added.) The court ordered that further findings be made on this issue.

*Chrysler Corp.* v. *California Unemp. Ins. Appeals Board, supra,* 199 Cal.App.2d 683, involved a different situation altogether from the ones described in the cases just recited. There, the claimants seeking benefits were office and clerical workers at a Chrysler Corporation plant. They belonged to one of three separate bargaining units consisting of office and clerical workers or engineers or production workers. All three units belonged to the same union, but each unit had a separate bargaining agreement with Chrysler. The office and clerical workers and the engineers had no right to strike; the production workers had a limited right to strike, over production rates.

A trade dispute arose over production rates and the production workers decided to strike. The other two units were not entitled to vote on the strike and they, in fact, voted separately not to participate. Their members crossed picket lines and continued to work. The claimants eventually were laid off because, as a result of the strike, there was no work for them.

The court upheld the claimants' eligibility for benefits. Reiterating the principles set forth in an earlier case (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321 [109 P.2d 935]), it stated that mere membership in a union was not sufficient to render an individual personally responsible for the acts of union officials in calling for a strike. (*Chrysler Corp., supra,*

199 Cal.App.2d at p. 688.) Personal responsibility was to be determined by other factors such as "voluntary joint activity, concert of action of the strikers and nonstrikers, an identity of interest in the dispute or strike, or union strategy ultimately resulting in the unemployment of nonstriking members." (*Ibid.*) The court went on to say that an employee was not disqualified " 'from receiving benefits in all cases where his unemployment results directly or indirectly from a labor dispute, but makes him ineligible only if he left his work because of the dispute. There must therefore be a direct causal connection between the trade dispute and the leaving of work.' " (*Id.*, at p. 696.) Inasmuch as the claimants had not in any way participated in the strike and had no interest in the dispute between the production workers and Chrysler, they had not left work voluntarily because of a work dispute.

 The cases discussed above consistently require for the purpose of denying benefits, a showing that a claimant was personally responsible for his unemployment by virtue of some voluntary, affirmative act which resulted in his failure to work. (*Matson Terminals, Inc.* v. *Cal. Emp. Com.*, *supra,* 24 Cal.2d 695, 703-704; *W. R. Grace & Co.* v. *Cal. Emp. Com.*, *supra,* 24 Cal.2d 720, 731; *Chrysler Corp.* v. *California Unemp. Ins. Appeals Board, supra,* 199 Cal.App.2d 683, 693.) Here, the volitional element was not met. Unlike *Matson,* the present claimants did not refuse to cross a picket line, and, unlike *Grace,* they did not refuse to work because other employees were striking. Assuming arguendo that the claimants may have had an identity of interest in the disputes (cf. *Chrysler Corp.*), in that the disputes concerned, at least in part, work conditions which would directly affect them, *Chrysler Corp.* makes it clear that this commonality of interest is but one means of establishing the extent of a claimant's personal responsibility for his unemployment.

Here, the evidence indicating that the claimants took no part in supporting the stoppages is undisputed and overwhelming. They were unaware of the strike, did not vote for the strike, and in no way participated in the strike. Inasmuch as they were not "within the call" and, thus, were not given an opportunity to accept or refuse to be dispatched, we will not infer what their decision would have been had they been "within the call."

The authorities cited above do not support PMA's contention that the volition element is satisfied because the claimants neither repudiated the work stoppages nor sought to replace strikers. The cases require evidence of personal responsibility for unemployment. The claimants' inaction—whether failure to repudiate or failure to volunteer for additional work—cannot be equated with support for Local 10's activities.

We reject, for another reason as well, PMA's suggestion that the claimants had an affirmative duty to seek work during a work stoppage in order to qualify for state unemployment compensation benefits. The parties agree that longshoremen are eligible for such benefits, as well as negotiated pay guarantee benefits, without volunteering for such work, when they are not "within the call" and no work stoppage is in progress. And PMA concedes that it "does not ordinarily oppose the unemployment insurance claims of longshoremen who are outside the call." It does so now, because "members of Local 10 refuse[d] to accept or to perform the work [requested by PMA] because their Union ha[d] directed work stoppages, and PMA [was] prevented, under the dispatch system . . . from contacting the men directly." For this court to conclude that the claimants should have volunteered for additional work simply because a work stoppage was taking place, so that they might establish their opposition to the work stoppage, would be tantamount to penalizing them for their union membership. Such a result is unacceptable. (*Chrysler Corp.* v. *California Unemp. Ins. Appeals Board, supra,* 199 Cal.App.2d 683; *Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d 321.)

We also conclude that the causation element is not met. PMA argues that Local 10's work stoppage strategy caused the unemployment of all of its members as a class—including that of the claimants. But, the fact that work went unperformed—whether because of union-directed stoppages, because the employers were not allowed under the terms of the Contract Documents to offer work to employees directly or because, as PMA claims, the agents carrying "hot sheets" walked off the job—is not relevant to establish the cause of a *particular* claimant's unemployment. Here, the claimants did not become unemployed because of Local 10 activities: Whether or not the work stoppages occurred, the claimants were not "within the call."

We conclude that the claimants did not leave their work because of a trade dispute; consequently, they are not ineligible for benefits by virtue of section 1262.

The judgments are affirmed.

Racanelli, P. J., and Newsom, J., concurred.