[No. A031528. First Dist., Div. Two. Apr. 9, 1987.]

BROTHERHOOD OF TEAMSTERS AND AUTO TRUCK DRIVERS, LOCAL NO. 70 et al., Plaintiffs and Respondents, v. UNEMPLOYMENT INSURANCE APPEALS BOARD, Defendant and Appellant;
DALZIEL SUPPLY COMPANY et al., Real Parties in Interest and Appellants.

1516

## COUNSEL

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, and Charlton G. Holland, Assistant Attorney General, for Defendant and Appellant.

Thomas J. Dowdalls, Bradley W. Kampas, J. Mark Montoblio and Severson, Werson, Berke & Melchior for Real Parties in Interest and Appellants.

Franklin Silver, Beeson, Tayer & Silbert and Beeson, Tayer, Silbert & Bodine for Plaintiffs and Respondents.

## OPINION

**BENSON, J.**—California Unemployment Insurance Appeals Board (Board) together with real parties in interest Dalziel Supply Company and other

employers in the plumbing supply business (employers) appeal a judgment of the trial court issuing a peremptory writ of mandate compelling the Board to set aside its decision to deny unemployment insurance benefits to certain claimants.

*Procedural History*

The administrative proceedings below were initiated as a result of a number of employees of the real parties in interest filing claims for unemployment benefits for the period of time the employees were locked out of work by their employers. The claims involved employees of 11 plumbing supply companies represented by 7 different local unions affiliated with the International Brotherhood of Teamsters and affected work locations in Alameda, Contra Costa, San Francisco, San Mateo and Santa Clara counties. All of the cases were consolidated for hearing before an administrative law judge of the Board. At the administrative hearing and throughout the proceedings before the Board, the individual claimants were represented by their respective unions and the individual employers were all represented by the same law firm.

At the administrative hearing all facts were stipulated to, and they consisted primarily of the facts stated in the investigation memoranda of the trade dispute section of the Employment Development Department. Following the hearing the administrative law judge issued a decision holding that all of the claimants were ineligible for benefits under section 1262 of the California Unemployment Insurance Code,[1] because they had voluntarily left their jobs due to a trade dispute. The claimants appealed that decision, and the Board upheld the decision except for Teamsters Local 287 in San Jose. The unions then filed a petition for writ of mandate in superior court without naming individual claimants as parties to the petition.

In their answer to the petition for writ of mandate both the Board and real parties in interest (the employers) argued, as an affirmative defense, that the unions lacked standing to bring the action. The trial court found that the unions had standing and granted the writ based upon the merits of the case.

*Factual Background*

There is no conflict as to the underlying facts. With the addition of one

---

[1] All further statutory references are to the Unemployment Insurance Code unless otherwise indicated.

paragraph from the administrative record, the superior court adopted the statement of facts contained in the Board's decision.

"The claimants are members of various locals of the Teamsters Union. These locals are numbered 70, 85, . . . 315, 655, 853 and 860. The employers are various employers throughout the geographic areas within the jurisdiction of the locals.

"Prior to 1982, each of the employers here involved had been represented by Northern California Suppliers Association as a multiemployer group in collective bargaining with the several union locals. In December 1981, each of the locals was advised by letter that the employers had withdrawn authority for collective bargaining from the association.

"Subsequently, the union locals were further informed that an identified law firm had been retained to represent all of the employers who had withdrawn from the association in upcoming negotiations with each union local. Sometime thereafter, negotiations commenced between each union local and the employers doing business in the local's geographic jurisdictional area. The locals determined it was most beneficial for all locals to be present at the negotiation sessions. Concurrent negotiations then continued in which all of the locals participated.

"The unions and employer representative report, however, that although these negotiations were concurrent, it was at all times the object of the negotiations to obtain separate agreements between each of the employers represented by the above-named law firm and each union. The unions report that although the Secretary-Treasurer of Teamsters Local 853 acted as coordinator and spokesperson during the negotiations, he did not have the authority to accept or sign contract proposals on behalf of the other unions.[2]

"Throughout the negotiations, all of the employers were represented by a single spokesperson (the identified law firm). Local 853 was the prime spokesgroup for all of the union locals except sometime after July 7, 1982 and before August 25, 1982 the locals were advised of the employers' intent to take a different position with Local 287, than with the other locals, and it was agreed that negotiations with Local 287 would be deferred pending settlement with the other locals.

---

[2] It was this paragraph that was added by the trial court. However, our court is unable to find what the trial court designated as a "paragraph from the stipulated record" in the record before it.

"By letter dated July 26, 1982, the employers' representative advised the spokesgroup and each local that a strike against one employer by any of the locals would be considered a strike against all of the employers within the jurisdiction of that local.

"The claimants are members of the several union locals who were locked out by the employers in the course of events related immediately below.

"On August 19, 1982, Local 70 engaged in a strike action against one of the employers in Alameda County; and on the following day all of the employers doing business within the geographic jurisdiction of Local 70 locked out those claimants who are members of Locals 70 and 853 employed by them in Alameda County.

"On August 24, 1982, Local 655 brought a strike action against one employer in San Mateo County and Local 860 brought a strike action against another employer in San Francisco County. On the following day, all of the employers doing business within the geographic jurisdiction of Locals 655 and 860 locked out those claimants who are members of Locals 655, 860 and 85 employed by them in San Francisco and San Mateo counties.

"On August 25, 1982, Local 315 brought a strike action against one of the employers in Contra Costa County; and on the following day, all of the employers doing business within the geographic jurisdiction of Local 315 locked out those claimants who are members of Local 315 employed by them in Contra Costa County.

"On September 17, 1982, Local 315 extended its pickets to an employer in Santa Clara County which employed members of Local 287. The members of Local 287 employed by that employer, who are not claimants herein, refused to cross the picket line. Effective at the close of business on September 17, 1982, all of the employers doing business within the geographic jurisdiction of Local 287 locked out those claimants who are members of Local 287 employed by them in Santa Clara County.

"In anticipation of Local 315 extending its pickets, the employers' representative had previously notified Local 287 that if the picket activity was extended, the employers would regard any employees who honored the picket line as having left work because of a trade dispute; and further, that a strike against one employer would be regarded as a strike against all employers."

*Unions' Standing to File Petition*

On appeal the Board cites *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321 [109 P.2d 935], for the proposition that the unions have no standing to bring this action, since they have no beneficial interest in its outcome. The unions, in turn, rely on several cases, the most pertinent of which are *International Union of United Auto. etc. Workers* v. *Department of Human Resources Dev.* (hereafter *UAW*) (1976) 58 Cal.App.3d 924 [130 Cal.Rptr. 368] and *Stanford* v. *Unemployment Ins. Appeals Bd.* (hereafter *Stanford*) (1983) 147 Cal.App.3d 98 [195 Cal.Rptr. 1], for authority that they do have standing to bring a petition on behalf of their members. For the reasons stated below we conclude the unions are correct in their position.

Code of Civil Procedure section 1086 expresses the controlling statutory requirements for standing for mandate: "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of *the party beneficially interested.*" (Italics supplied.) ██ Although it is not necessary that someone who petitions for a writ of mandate be a party to the action below, he must demonstrate that he is beneficially interested in the outcome of the proceeding. (*Peery* v. *Superior Court* (1981) 29 Cal.3d 837, 841 [176 Cal. Rptr. 533, 633 P.2d 198].) "The requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.]" (*Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].)

██ Whether a voluntary membership organization such as a union has standing to bring an action as the representative of its constituents has been addressed by the United States Supreme Court in *Warth* v. *Seldin* (1975) 422 U.S. 490 [45 L.Ed.2d 343, 95 S.Ct. 2197].[3] "Even in the absence of injury to itself, an association may have standing solely as the representative of its members. [Citation.] . . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. [Citation.] So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate

---

[3]State law on standing for mandate is consistent with federal law. (See *Carsten* v. *Psychology Examining Com., supra,* 27 Cal.3d 793, 797.)

representative of its members, entitled to invoke the court's jurisdiction." (*Id.* at p. 511 [45 L.Ed.2d at p. 362].)

Summarizing the *Warth* decision, the high court subsequently recognized that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Hunt* v. *Washington Apple Advertising Comm'n* (1977) 432 U.S. 333, 343 [53 L.Ed.2d 383, 394, 97 S.Ct. 2434].)

Examining the matter before us with a view toward the criteria set forth in *Warth* and *Hunt,* we initially observe that the union members, claimants below, necessarily had standing to challenge the Board's determination since the members were parties under section 410.

Next we look to the requirement that the interest the unions seek to protect be germane to their organizational purpose, and we find that it also is met under the circumstances of this case. Here the members assert a right to unemployment benefits because they claim their job loss resulted from an employer lockout. The Board, on the other hand, declined entitlement on the basis that the members had voluntarily left their jobs due to a trade dispute. It is patently a matter of union purpose to maintain the integrity of the collective bargaining process. It is also a matter of union interest to protect its members from what is perceived to be a wrongful denial of benefits arising from a breakdown of the collective bargaining process. If, in fact, the Board's determination to deny benefits is in error, a question which we shall ultimately deal with, then the integrity of the collective bargaining process has been weakened for the employers would have obtained a tactical negotiating advantage that they do not deserve. Thus we find interest and purpose in tandem, satisfying the second criterion.

We turn now to the third requirement that neither the claim asserted nor the relief requested requires the participation of individual members. In resolving this question we are assisted by *United Automobile Workers* v. *Brock* (1986) 477 U.S. 274 [91 L.Ed.2d 228, 106 S.Ct. 2523]. In *Brock,* a union, together with several of its members, filed an action for declaratory and injunctive relief seeking to require the Secretary of Labor to revise guidelines restricting payment of supplemental unemployment benefits under the federal Trade Act of 1974. The union sought revision of the guidelines on behalf of its members, who were both named and unnamed in the complaint. Some members had been denied benefits by state unemployment agencies,

some had been awarded benefits, and some were alleged to be entitled to the benefits but had not filed claims. In considering the question of whether the union had standing to bring the suit as the representative of its members, the court set forth the applicable standards as articulated in *Warth* and *Hunt*. With respect to the third criterion in *Hunt* the court concluded: "Neither these claims nor the relief sought required the District Court to consider the individual circumstances of any aggrieved UAW member. The suit raises a pure question of law: whether the Secretary properly interpreted the Trade Act's TRA eligibility provisions. [Citation.] And the relief requested, and granted by the District Court, leaves any questions regarding the eligibility of individual TRA claimants to the state authorities given jurisdiction over such questions by 19 USC § 2311(d) .... See *Bowen* v. *City of New York*, 476 U.S. 467, 485, 90 L Ed 2d 462, 106 S Ct 2022 (1986)('by ordering simply that the claims be reopened at the administrative level, the District Court showed proper respect for the administrative process'). Thus, though the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him, the UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured,' [citation]." (*Id.* at p. 288 [91 L.Ed.2d at pp. 241-242].)

The circumstances in *Brock* are closely analogous to those in the case at bench and we find *Brock's* reasoning and conclusion persuasive. Here, as in *Brock*, the mandate proceeding raises a pure question of law, i.e., whether the Board properly interpreted section 1262 in denying its benefits to the union member claimants. Although the Board may have to determine each claimant's benefits, the unions may litigate this case without the participation of its members and still insure that the remedy, if granted, will inure to the benefit of those union members who have been injured.

This analysis is consistent with the results but not the reasoning in the *UAW* and *Stanford* cases relied on by the unions. In *UAW*, a petitioner for writ of mandate was brought by 10 workers and their union to challenge a ruling of the Board denying benefits on the grounds that the workers, by absenting themselves from the state, made themselves unavailable for work and therefore ineligible for unemployment insurance benefits. The Court of Appeal, while denying the union's and workers' claim on the merits, held that the union had standing to bring the action. Relying on *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276 [32 Cal.Rptr. 830, 384 P.2d 158] and *California Sch. Employees Assn.* v. *Willits Unified Sch. Dist.* (1966) 243 Cal.App.2d 776 [52 Cal.Rptr. 765], two cases where the employee associations were determined to have standing to bring actions

against employers for primarily injunctive relief, the *UAW* court reasoned: "A labor union is entitled to represent its members in an action which is inseparably founded upon its members' employment. Unquestionably, the case at bar, in which the members' employer is the real party in interest, is such an action. Accordingly, petitioner UAW has standing to be a party petitioner in the immediate action." (58 Cal.App.3d at p. 935.) However, the court then went on to hold that the union had failed to state a cause of action. Since the original petition did not allege that any right of the union had been invaded and the union did not request that any relief be granted to it, no cause of action had been stated. Because the petition named the individual members as parties, the union was found to be an unnecessary party. Without further analysis, the *Stanford* case adopted the reasoning of *UAW*.

The difficulty with *UAW* and *Stanford* is that neither case discusses the Code of Civil Procedure section 1086 requirement that a party petitioning for a writ of mandate must be beneficially interested. Nor do the cases address under what circumstances unincorporated associations, such as the unions herein, have standing to represent the interests of their members. Nevertheless, we agree with the holding in these cases that the unions have standing to sue. Here, we expressly determine that the unions have a beneficial interest and thus standing to represent their members in this proceeding. Accordingly, we address the merits of the case.

*Entitlement to Unemployment Insurance Benefits*

In rendering its judgment to issue a peremptory writ of mandate, the trial court explained as follows: "The conclusion of the Appeals Board that the claimants represented by petitioners are ineligible for benefits under Unemployment Insurance Code section 1262 because they voluntarily left their jobs due to a trade dispute is not supported by the findings and is erroneous as a matter of law. *Coast Packing Co.* v. *California Unemployment Ins. App. Bd.,* (1966) 64 Cal.2d 76 [48 Cal.Rptr. 854, 410 P.2d 358]). Real Parties in Interest initiated the trade dispute by locking out their employees. The action of petitioners in striking other employers did not initiate a trade dispute with Real Parties in Interest because these employers had withdrawn from the previously existing multiemployer association and had at all relevant times insisted on the right to negotiate separate contracts with the various unions. Therefore, this case is distinguishable from *McKinley* v. *California Employment Stabilization Commission,* 34 Cal.2d 239 [209 P.2d 602], and *Gardner* v. *State of California,* 53 Cal.2d 23 [346 P.2d 193]. Accordingly, the Appeals Board prejudicially abused its discretion in denying unemployment benefits to the claimants."

The employers dispute the trial court's ruling that the claimants are not disqualified from receiving benefits as a matter of law.

■ As a general rule, the trial court exercises its independent judgment on the evidentiary record of the administrative proceedings before the Unemployment Insurance Appeals Board. (*Thomas* v. *California Emp. Stab. Com.* (1952) 39 Cal.2d 501, 504 [247 P.2d 561]; *Lozano* v. *Unemployment Ins. Appeals Bd.* (1982) 130 Cal.App.3d 749, 754 [182 Cal.Rptr. 6].) On appeal, the reviewing court decides whether the lower court's findings and judgment are supported by substantial evidence. (*Pacific Maritime Assn.* v. *Unemployment Ins. Appeals Bd.* (1985) 169 Cal.App.3d 568, 574 [215 Cal.Rptr. 408].)

"When, however, the facts before the administrative agency are uncontroverted, the trial court's determination involves only a question of law. Appellate review in such a case is based not upon the substantial evidence rule, but upon the independent judgment rule. [Citations.]" (*Pacific Maritime Assn., supra,* 169 Cal.App.3d at p. 574.) Since the facts are undisputed in the present case, we treat the issue as one of law and conduct an independent analysis.

Section 1262 states: "An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

■ "The stated legislative purpose of the Unemployment Insurance Program is to reduce *involuntary* unemployment and to relieve the hardship on persons who *through no fault of their own* become unemployed. [Citation.] [¶] Section 1262 specifically dealing with labor disputes, manifests the state's desire to maintain neutrality [citation] and not to require the employer to subsidize, through his contributions to the fund, the use of the strike as an economic weapon against him." (*National Broadcasting Co.* v. *Unemployment Ins. Appeals Bd.* (1979) 95 Cal.App.3d 550, 554-555 [157 Cal.Rptr. 207], italics in original; see also *Pacific Maritime Assn.* v. *Unemployment Ins. Appeals Bd., supra,* 169 Cal.App.3d at p. 575.)

■ A two-part test is applied for determining whether a claimant is ineligible to receive unemployment benefits pursuant to section 1262: First, the employee must voluntarily leave or remain away from his employment (a volitional test); and second, the employee must leave or remain away from

his employment because of the trade dispute (a causation test). (*Ruberoid Co.* v. *California Unemployment Ins. Appeals Board* (1963) 59 Cal.2d 73, 77 [27 Cal.Rptr. 878, 378 P.2d 102]; *Pacific Maritime Assn.* v. *Unemployment Ins. Appeals Bd., supra,* 169 Cal.App.3d at p. 575.)

The " 'volitional' test," with which we are here concerned, "postulates the need for an inquiry into the dynamics of the circumstances which have created the unemployment, the criteria for denial or awarding of benefits being the personal responsibility of the claimant for his unemployment in the former case [citation], or the fault of the employer in the latter case. [Citation.]" (*Chrysler Corp.* v. *California Emp. etc. Com.* (1953) 116 Cal.App.2d 8, 15 [253 P.2d 68].)

The conflict in the instant action arises from the difference in the parties' views as to the cause of the claimants' unemployment. The employers contend that because the unions were concurrently negotiating through a primary spokesgroup with a single spokesperson for the employers and had been informed that a strike against one employer in a specific jurisdiction would be considered a strike against all the employers in that jurisdiction, the claimants were out of work after the lockout because of their own conduct and that of their local unions. On the other hand, the unions take the position that since the employers had withdrawn authority from the Northern California Suppliers Association to bargain collectively on their behalf and had announced that each employer would enter into an independent agreement with each union, the employers had foresworn the obligations imposed by multiemployer bargaining, yet now seek to avail themselves of one of its primary benefits, i.e., the ability of the employers to declare that a strike against one is a strike against all and to lock out employees of the nonstruck employers. Our resolution of this dispute requires an analysis of pertinent case law concerning the volition test.

In *Bunny's Waffle Shop* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 735 [151 P.2d 224], restaurant employers sought to force unions to bargain with a new employers' organization by reducing wages, extending the work week and instituting split shifts. When a number of employees quit, the employers closed the restaurants. The ensuing claims for unemployment benefits posed the question of whether the trade dispute provision of section 1262 disqualified the workers who had left their jobs. Our Supreme Court rejected the contention that the employees had voluntarily left their jobs as a direct result of a trade dispute. It stated: "When the new conditions of work were finally announced by the employers, they were not offered as bona fide proposals for the continued operation of the employers' places of business, but were imposed for the sole purpose of coercing the unions into bargaining collec-

tively with the employers' representative and were to continue only until the union agreed to do so. Admittedly they were an economic weapon designed to compel compliance with the employers' demands, and when claimants left their work, they left because of this economic weapon and not because of the trade dispute then in existence. The fact that the trade dispute was unquestionably the motivating cause of the employers' acts does not establish any direct causal relation between the dispute and the employees' leaving of work." (*Id.* at pp. 740-741.) The court then went on to state: "A strike against a single member of an employers' collective bargaining unit involves economic action against that employer only and subjects to disqualification under the Unemployment Insurance Act those employees only who leave their work because of the dispute. If the other employers thereupon choose to close their establishments and lock out their employees, such employees cannot be charged with leaving their work because of a trade dispute." (*Id.* at p. 741.)

The reverse situation was presented in *McKinley* v. *California Emp. etc. Com.* (1949) 34 Cal.2d 239 [209 P.2d 602], wherein an employers' association was bargaining with the bakery workers' union to obtain an industry-wide master collective bargaining agreement. After the association had informed the union that it would treat a selective strike against any one or more of the association members as a strike against all association members, the union declared a strike against one of the association members. Within a few days, the other employers closed their plants. In considering whether the locked out employees could receive unemployment insurance benefits, the high court reasoned as follows: "The volitional test established in *Bodinson Mfg. Co.* v. *California Emp. Com.,* 17 Cal.2d 321 [109 P.2d 935], was based upon the principle that innocent victims of a trade dispute should not suffer loss of their unemployment insurance rights. But the unemployment of the bakery workers was caused by their own action taken with full knowledge of its consequences. In the waffle shop case [*Bunny's*], the unemployment was due to a lockout; here the lockout of the bakers was due to a strike. The lockout of the restaurant workers was attributed to the concerted action of the employers; the strike of the bakers was by the vote of all the employees concerned and was directed against all of the employers who were parties to the master contract. The volitional test itself is based upon a just analysis of a substantial subjective element and it cannot properly be extended or perverted by insistence upon mere form. In this case the union members knew from letters and statements as well as from prior strike action that any strike during negotiations would result in stoppage of all work. When, in the face of that information, union members authorized a strike, they placed themselves outside the class of persons who are properly protected by the subjective volitional exception to section 56 which was stated and applied in the Bodinson case." (*Id.* at pp. 244-245.)

However, *McKinley* also notes: "Either the union or an individual employer, at any time, could have broken off joint negotiations and bargained with its employees on an individual basis. But that course was not taken. At no time did the union purport to be directing any action solely against the Butter Cream plant; instead, the union continued throughout to deal directly with the association for the purpose of obtaining a new master contract. To say, therefore, that the act of striking the one plant did not shut down work in other plants of the association which were subject to the labor negotiations for the purpose of obtaining a master contract is wholly unrealistic. Industry-wide negotiations had been established by these employers and consistently carried on for over 10 years." (*McKinley* v. *California Emp. etc. Com., supra,* 34 Cal.2d at p. 244.)

In addition to the first quoted passage from *McKinley,* the employers cite *Gardner* v. *State of California* (1959) 53 Cal.2d 23 [346 P.2d 193] and *Chrysler Corp.* v. *California Emp. etc. Com., supra,* 116 Cal.App.2d 8 for the proposition that membership in an association is not a prerequisite for the employers' lockout in response to a strike against one employer. It is unnecessary to fully discuss *Gardner,* since the unions in that case were negotiating for a master agreement covering *all* members of the employer association plus nonmembers who had given the association authority to negotiate labor matters for them.

We likewise find *Chrysler* distinguishable. In *Chrysler,* both union and nonunion workers were employed by the company. For the purposes of collective bargaining, all of Chrysler's employees were divided into four separate groups: i.e., production workers, engineers, office workers, and cafeteria workers. However, the same union was the collective bargaining agent for each category of workers.

In 1949, the union served the employer with written demands for changes in the basic labor agreement between the employer and employees on behalf of all the individual categories of workers. Thereafter, all of the union members in all of the categories voted to strike the employer's Los Angeles plant, if called upon by the union to do so. It was later determined by the union, as a matter of strike strategy, that only the production workers would be directed to strike. After being advised on the union's strategy, union members again voted to abide by this decision. When the production workers went out on strike, the office workers and other employees remained at work. However, three weeks after the production workers launched their strike, there occurred a gradual diminution of work for the office personnel. The employer then informed these employees that because of the lack of work their services were no longer required. Following these events the office workers filed claims for unemployment insurance benefits.

In reviewing the case, the trial court and Court of Appeal found that the officer workers "had voluntarily participated in a trade dispute with [Chrysler] and had engaged in conduct which set in motion a chain of events culminating in the closing of [Chrysler's] Los Angeles plant, thus causing their own unemployment." (*Chrysler Corp.* v. *California Emp. etc. Com., supra,* 116 Cal.App.2d at pp. 12-13.)

We find *Chrysler* inapposite to the case at bench for two reasons. First, all the Chrysler union employees initially voted to strike. After the union decided, as a matter of strike strategy and policy, that only the production employees would strike, the office workers attended a general meeting where they voted to conform to and abide by the union's decision. Thus, the office workers participated in the events leading up to the strike, supported the tactical decisions made by their union and permitted the use of the pro duction workers' strike as "the instrumentality for the effective implementation of the overall strike strategy." (*Chrysler Corp.* v. *California Emp. etc. Com., supra,* 116 Cal.App.2d at p. 17.) This orchestrated action was evidenced by a union bulletin circulated at the employer's premises which explained the union's decision not to have the office workers strike and how the office workers would benefit from the strike by the production workers. No similar evidence of unity of effort was presented in this case.

Second, the lockout in *Chrysler* was directly attributable to the actions of the employees. As a result of the strike by the production workers, work for the office personnel diminished. Consequently, Chrysler was forced to shut down operations due to the strike. In contrast, the unstruck employers in this case voluntarily locked out their employees as a punitive measure against the union which had selectively struck another employer. Unlike the circumstances in *Chrysler,* where no option was available to the employer, the employers here were free to remain open and continue business as usual.

We also find it noteworthy that in *Chrysler,* the nonunion workers were found to be eligible for unemployment insurance benefits. This is because there was no evidence that these workers had performed any overt acts that placed them in league with the union workers in causing the strike. It was therefore determined that the unemployment of these employees could not be attributed to any action on their part.

Simply stated the question we must resolve is whether the condition of unemployment visited upon the union employees through the lockout was caused by some conduct of their own in furtherance of the unions' side of the dispute. If they are faultless, then they should be relieved of the hardships occasioned by the denial of unemployment insurance benefits; if they share

blame in bringing about the lockout, then the state should not be compelled to shed its neutrality and subsidize the union side of a trade dispute by allowance of unemployment benefits from a fund created by the employers. ■ The circumstances of this case require us to conclude that the employees are without fault and thus are entitled to benefits as the trial court correctly determined.

Critical to our decision is the posture taken by the employers at the commencement of and throughout the negotiations. While engaging a law firm to act as the negotiating agent on behalf of all, they nonetheless insisted that separate contracts be negotiated between each union and each employer, thus effectively rejecting industry wide negotiations and a master contract which would be binding on all employers. It is this scenario which distinguishes this case from *McKinley, supra,* 34 Cal.2d 239, where the court, addressing a situation involving industry wide negotiations directed toward concluding a master contract, rejected as "unrealistic" the contention that selective strike action against one member plant did not shut down work in other plants of the association.

Here, each employer was a distinct bargaining unit. A strike against one employer in no way jeopardized the ability of any other employer to negotiate its own separate contract. Nor could a selective strike against one employer be said to have adversely effected the bargaining position of other employers where there was no unity of interest in negotiating a master agreement.

Essentially what the employers propose is that they be relieved of whatever burden they perceive to exist in collectively negotiating to an industry-wide contract, and yet be permitted to retain the benefit of collectively imposing economic sanctions against employees who are not involved in strike action.

Under these circumstances, where employers, who have retained their right to separately negotiate individual contracts, band together on a geographical or industry-wide basis to impose a general lockout when one of their number is subjected to strike action, we determine those nonstriking employees to be innocent victims of a trade dispute who should not be deprived of their unemployment benefits. To adopt the contrary view would, in our judgment, have the unwelcome consequence of permitting an economic tactic to askew the state's position of neutrality toward the employers' side of the dispute and impose hardship on employees forced into unemployment through no fault of their own.

The judgment is affirmed.

Kline, P. J., and Rouse, J., concurred.

The petition of real parties in interest and appellants for review by the Supreme Court was denied July 2, 1987.